Brockway Motor Truck Corporation, Plaintiff, *v.* City of New York and Others, Defendants.*

Supreme Court, New York County, November 27, 1931.

* See, also, 142 Misc. 523.

*Joseph L. Greenberg,* for the plaintiff.

*Arthur J. W. Hilly, Corporation Counsel* [*Nelson Rosenbaum* of counsel], for the defendants.

COTILLO, J. The plaintiff in a taxpayer's action is seeking to restrain the defendants from receiving bids for furnishing and delivering motor-driven snow brooms to the department of sanitation of the city of New York and from making an award on the bids so received, and is also seeking to direct the defendants to prepare specifications for the said motor-driven snow brooms so that " assemblers " as well as " manufacturers " can bid for the said equipment.

The commissioner of purchase for the city of New York is now advertising for bids for furnishing and delivering motor-driven snow .brooms to the department of sanitation. The specifications for this equipment, of which the plaintiff is complaining, provide as follows: " (d) That the manufacturer of the chassis has in operation a factory adequate for and devoted to the manufacture of the motor or engine, transmission, front and rear axle which it proposes to furnish in the chassis. (h) That the manufacturer of the chassis has been engaged in the continuous manufacture and advertised sale of motor truck chassis for at least ten years." The plaintiff in this action is not a manufacturer within the meaning of said specifications, but is what is called in the automobile trade an assembler. The complaint alleges that the invitations to bid illegally restrict the field of competitive bidding, and thereby result in excessive prices. These allegations are sufficient as to both illegality and waste. The final allegation that the plan will be a fraud upon the taxpayers is merely a reiteration of waste and not intended to aver that the plan was conceived in fraud. Being unnecessary to sustain the complaint otherwise, it is not open to the objection in *Knowles* v. *City of N. Y.* (37 Misc. 195) in respect of a failure to state the facts constituting the fraud. The course of conduct of the sanitary commission should not be overruled by judicial order on questions involving judgment and discretion unless

fraud, collusion, corruption, bad faith, waste of public funds, improvident contracting and extravagance are charged and sustained. No question of fraud, collusion, corruption or bad faith is involved herein. Waste of public funds, improvident contracting and extravagance by these defendants are the sole causes upon which this injunction may be granted.

The general principles relating to competitive bids for work and materials to be furnished to a municipality are thus stated in McQuillin on Municipal Corporations ([2d ed.], § 1301): " The request for bids must not unduly restrict competition. All persons or corporations having the ability to furnish the supplies or materials needed, or to perform the work to be done should be allowed to compete freely without any unreasonable restrictions." If plaintiff by uncontroverted evidence proves its contention, it has made out a case for an injunction. In its supporting affidavits plaintiff sets forth at great length that the language of the specifications shuts out from bidding an entire class of truck manufacturers including the plaintiff, regarding whose facilities for making good on contracts and repairs and regarding whose financial ability there is no doubt. It shows as a corollary from these considerations that the restricted competition tends to extravagance in price for a product in no way superior to that of the class shut out. It is the contention of the city in reply that the purpose of the aforesaid specifications is to obtain bids for motor-driven snow brooms from builders who furnish a chassis or motor which is made by a manufacturer and not by an assembler who assembles the chassis or motor from parts produced by other firms. The defendants also agree that it is the experience of the department of sanitation and its predecessor, the department of street cleaning, that makers of assembled trucks constantly change their source of supply for the principal parts used on the chassis, and because of this fact do not have on hand a ready supply of repair parts, and that this inability to secure essential repair parts results in the disruption of the normal activities of the department, and in many instances shortens the life of the equipment. In short, it is claimed that in making purchases from manufacturers of trucks, as distinguished from assemblers, the city is assured of a more certain supply of parts for replacement. In addition to this contention the city urges the financial instability of the assemblers and their transiency of life.

As to the first contention, the court, while not pretending to qualify as an expert, is not entirely impressed with the argument of the superiority of manufactured trucks over assembled trucks, particularly in the matter of ease of replacement of parts. I believe that the principle of specialization in this industry is conducive to

better and more economic result than the principle of having a truck manufactured under one roof. From a reading of the opinion in the affidavits of the various experts, it seems to me that the term "manufactured completely within its own plant" and the term "assembled" are relative terms; that those who pursue the method referred to as the "production of manufactured types" use, to a substantial extent, the practice of purchasing certain parts from outside suppliers; that the difference between the two methods of manufacture is one of degree rather than fundamental, and that actually all motor trucks are manufactured much the same way. Does the manufacturer build his own truck? Does he not, as a matter of fact, whether he is of one type or the other, purchase numerous constituent, manufactured items? Does not the quality of the finished product depend rather upon co-ordinated engineering? With the modern facilities for specifying, testing and inspection, the desired quality of a unit can be purchased and maintained by an independent manufacturer, and I do not know but that this method of manufacture or assembling provides the same quality of material and workmanship as is obtained by those who purport to manufacture completely within their own plant. The statistics submitted to me by the different experts indicate that while in the early days of the industry most automobile trucks were of the so-called "built under one roof" type, the tendency of recent years has been toward trucks designed and built to use units produced by specialists in the manufacture of such units. An automotive vehicle is an intricate and highly refined piece of machinery; it has been developed rapidly and to a remarkably high degree of perfection. No one organization could possibly be responsible for so rapid and remarkable a development, which has been the result of the inventive genius and manufacturing refinement of the great body of automotive engineers. This applies to every part of the vehicle; that is to say, to the motor, to the axle, to the transmission, to the wheels and to many other minor components, such as carburetors, magnetos, spark plugs, universal joints, bearings, piston rings and countless other items. It is to the specialist in each line that the vehicle builder must look for improvement in the various components. As a matter of fact, the vehicle builder has a full task in assembling these component parts into a chassis, then equipping the chassis with a suitable body, and finally marketing the body. A vehicle builder who would close his doors to the advances in the art of producing component parts would soon find himself producing a vehicle with obsolete parts; therefore, his alternative is to leave the production of many of the component parts to specialists. If a manufactured vehicle

were produced after the manner of Holmes' "wonderful one-hoss shay," all parts of which were co-eval with the life of the entire vehicle, a sound and irrefutable argument in favor of the manufacture under one roof would exist. But it is undisputed that the life of a truck is prolonged by the constant replacement of perishable parts. In the matter of facility of replacement the argument of the assemblers seems much more plausible.

The second contention of the defendants in relation to the financial· instability of the assemblers, is vigorously disputed by plaintiff. The latter, an assembling concern, was incorporated in the year 1922 under the laws of the State of New York as the successor corporation to W. N. Brockway Corporation, incorporated in 1875. It maintains two manufacturing and assembling plants, one in Cortland, N. Y., covering approximately twelve acres, and another in Marion, Ind., of equal size, and has manufacturing facilities for 20,000 trucks a year, and it has since 1922 manufactured, sold and delivered in excess of 75,000 trucks for every known trade and industry, supplying some of these trucks to some 726 different State, county and city governments, including the sanitation department of New York city, which as recently as 1929 purchased twenty trucks for the use of the street cleaning department. As far as the financial ability of these assemblers is concerned and the fear expressed in the city affidavits that they would be unable to obtain the proper parts, it is only necessary to refer to several essential parts, to wit, the axle, the gears and the motors. The Timken Detroit Axle Company, which supplies the greatest number of axles used in motor trucks in the United States, is one of the largest corporations in America, having been engaged in business for a decade or more, with a working capital of approximately $20,000,000. The Brown-Lipe Gear Company is a corporation having upwards of $16,000,000 working capital; and the Continental Motors Corporation, according to Poor's 1930 Manual, has a working capital of upwards of $35,000,000. In these three essential parts alone a total working capital of $71,000,000 is represented, and distribution and availability of parts is so universal and so well established, that the argument of the corporation counsel that part manufacturers and assemblers go out of business more frequently than manufacturers and assemblers is without force. The affidavits indicate the contrary to be the fact, viz., four manufacturers of motors have bid for the motor brooms to be supplied, as against a total of thirty assemblers available to bid for the same, with facilities for obtaining uniform standardized parts. These facts show that the allegation as to the financial instability of the assemblers is without foundation. Scrutinizing

further the contention by the city of the transient life of the establishments that assemble these trucks, I feel that they can be tested by the fact that the Diamond T Truck Company has been in existence twenty-six years, and that the plaintiff corporation and its predecessor have been in existence since 1875.

Perhaps a strict reading of the opinion of the Court of Appeals in *Talcott* v. *City of Buffalo* (125 N. Y. 280) might lead to the conclusion that the discretion of public officials, unless the result of corruption, fraud or bad faith amounting to fraud, should not be disturbed. On the other hand, that decision was handed down in 1891, and the financial undertakings of the city to-day are on a vastly larger scale. Besides, experience since that time has shown that the term " discretion " is apt to cover a multitude of sins. Judge PECKHAM, in the dissenting opinion in the *Talcott* case, has expressed the current economic attitude, which is confirmed by the experience of forty years that have elapsed since it was written: " Under the statute▐as it now reads, I think the court has jurisdiction to enjoin the performance of an act by a public officer of the kind mentioned therein, if it be of such character as to necessarily result in a plain, bald, useless waste of the property or funds of the public. The act must be such that there can be no fair question, in the judgment of reasonable men, as to its character. It must be plainly and beyond all fair controversy wasteful; a mere squandering of public funds. In such case I do not think it necessary to allege or prove that a corrupt or fraudulent intent accompanies the act. Jurisdiction in the courts to enjoin such conduct on the part of public officers, who are merely trustees for the public, would be, in my judgment, exceedingly healthful, and I think no strained construction of the statute is necessary to hold that such jurisdiction has been granted by it. * * * The construction I contend for would not result in the mere substitution of the judgment of the court for that of the body to which the law confided the administration of such matters. If it were possible for fair-minded men to differ in regard to the character or policy of the proposed act, then the judgment of the officers should prevail. If, on the contrary, the proposed act were of the character I have already described, then the court should have power to enjoin it, and I believe the statute confers such power. The right, at some future time, to elect other officers in place of the reckless ones who have already wasted the moneys of

the public, affords no redress for the wrong already done, and experience has shown that it has the very slightest deterrent effect."

In *People ex rel. Haecker Sterling Co.* v. *City of Buffalo* (176 N. Y. Supp. 642) relator applied for mandamus to compel the commissioner to award to it the contract to furnish nine tractors for use in connection with flusher trailers in cleaning the streets of the city, it being claimed that the relator was the lowest bidder. The court, while denying the writ, reviewed certain principles applicable to a situation like the present one, which negatives the view that the discretion of the officials in refusing to make an award to a lowest bidder is an absolute one, or that they could arbitrarily reject such a bid under the cloak of the exercise of discretion. In that case it was decided that it was a proper exercise of judgment to give preference to a bidder which manufactured its own parts over the maker of an assembled car. The reasons applicable to the particular case were given as follows: " In the instant case it appears that the city owns six of the Pierce tractors, which it has operated for several years; that they have demonstrated their durability, efficiency and economy; that the parts thereof are interchangeable with those now proposed to be furnished; that the Pierce Company manufactures all of its own parts at its plant, which is located in Buffalo, and that the tractor of the relator is an assembled car, and that replacement of worn or broken parts is for that reason much more difficult; that the two-speed power take-off, which is part of the equipment of the Pierce Arrow truck, is better adapted to the operation of the flusher; that in material, workmanship, and consequent durability the Pierce truck is in the long run the more economical. This determination involved the possession of expert knowledge, which it must be assumed that the commissioner of public works possessed, and that the exercise of discretion on the part of himself and the common council, and I have every reason to believe that the determination was made in good faith."

In the present case the circumstances would seem to indicate the wisdom of an opposite conclusion. The manufacture of parts has become so standardized that a wise economy would indicate the desirability of not excluding such manufacturers from bidding; particularly where it appears that such bids are apt to be lower than those of the manufacturers of entire cars, even if it should be admitted that there are such makers in existence. The argument of convenience submitted by the defendant, based upon the facility of repair, seems to refute itself in view of the vast distribution by manufacturers of parts and the large capital invested by them. Since the decision in the *Haecker Sterling* case in 1919,

even those manufacturers who formerly fabricated all their parts have become in large measure assemblers. If the so-called self-subsisting manufacturer who has furnished certain machinery to the city should go out of business, the problem of replacement would be much more difficult than in the case of a car assembled from standardized parts.

While the plaintiff presents powerful and almost irrefutable arguments to sustain its contention of abuse of discretion resulting in probable waste, a temporary injunction should nevertheless not be granted in the present case. Such an injunction might hinder the city in the prosecution of its necessary activities, and by virtually forcing a change of specifications in advance of trial, would grant to plaintiff the full measure of relief which it could only obtain after a trial. In the situation I deem it more advisable to deny the motion on condition that the case be set down for an immediate trial on December 7, 1931. The imminence of such a trial would seem to make it unnecessary to dispose of the motion on the merits unless the city should decline to proceed. Motion disposed of as indicated. Settle order.