Samuel Dickstein, J.
This is a taxpayers’ action brought under section 51 of the General Municipal Law to restrain the defendants from perfecting or awarding a proposed contract for the purchase of parking meters after the opening of bids therefor.
Plaintiffs assert in their complaint that the notice of proposal for bids and the specifications are unreasonable, arbitrary and illegal in at least two respects, thus precluding free and competitive bidding and causing a waste of the taxpayers’ money. The first of these two requirements that plaintiffs ’ claim is arbitrary, unreasonable and illegal is as follows: “ Qualification of Bidders. The manufacturers must have been engaged in the manufacture of parking meters for at least five years and must submit satisfactory evidence of the successful operation for three years in the field of at least 500 meters made by them and of the general type proposed to be furnished under this bid ”.
Plaintiffs object to this provision because they have only been manufacturing and selling their twin-type parking meters for about four years.
The second requirement plaintiffs object to is as follows: ‘ ‘ The meters shall be designed to regulate parking in one and only one parking space.”
Plaintiffs’ objection to this provision is based on the fact that they manufacture only the twin parking meter which is designed to take care of two parking spaces with a single stanchion and meter.
The City of New York has completed surveys in the interest of traffic control to determine particularly whether meter parking would be feasible in New York City in the regulation of traffic. It has determined the five selected areas should be tested for that purpose by the installation of single-space type meters according to planned specifications drawn after full physical research. The entire plan is experimental only and restricted to a very minute portion of the ultimate area of such control should the plan be utilized eventually in its fullest possible scope. Plaintiffs’ twin-type meter is a device that controls two car spaces. This, defendant says, was rejected as being inflexible and not adaptable to the varying situations confronted on New York City sidewalks. The manifold obstructions and installations render the twin-type meter unusable.
*926 The instant proposal was for 1,500 single-type meters. Section 347 of the Charter of the City of New York requires “ All purchases shall be based upon specifications which are definite and certain, which permit of competition”. It is not unusual in the purchase by the city of mechanical devices to require a minimum of years of experience in manufacture and a minimum of years of successful operation of a minimum number of the machine to be purchased. It does not necessarily follow that a practice followed and handed down from administration to administration or a particular set of specifications customarily used as departmental practice are reasonable in the particular instance. In connection with the exclusion of an article claimed to be able to do the job desired it must be shown that the type selected is superior to the type excluded. It is for plaintiffs to establish fraud, corruption or bad faith and it is for defendants to establish superiority. The taxpayer is not to be denied the competition of an article and possible advantages and savings in the absence of clear superiority.
“ While the court may not substitute its judgment for that of the responsible officials charged by law to act, in the absence of fraud, corruption, or bad faith (Talcott v. City of Buffalo, 125 N. Y. 280; Ziegler v. Chapin, 126 id. 342; cf. Brockway Motor Truck Corp. v. City of New York, 145 Misc. 693, 698), where there is no clear showing that the particular product specified is so far superior as to require its exclusive use in order to meet performance requirements desired, the agents of the city are not justified in, and will be enjoined from, restricting bids to that product in exclusion of all others. (See Warren Brothers Co. v. City of New York, 190 N. Y. 297, 309.) For in these circumstances the intentional arrangement of specifications so as to shut out competitive bidding, whatever the motives may have been, renders that act illegal. (Matter of McNutt Co. v. Eckert, 257 N. Y. 100, 107.)
“ It is true that mere illegality is not enough to justify injunctive relief at the request of a taxpayer where waste or injury is not involved. (Western New York Water Co. v. City of Buffalo, 242 N. Y. 202, 206.) It must further appear that ‘ the threatened act is such as to imperil the public interests or calculated to work public injury or produce some public mischief. ’ (Altschul v. Ludwig, 216 N. Y. 459, 467.) But 4 where a statute requires purchases to be made by competitive bidding, the fact that such bidding is prevented is in itself presumptive evidence of injury to the taxpayers.’ (Grace v. Forbes, 64 Misc. 130, 139.) In this view, actual waste or injury to the municipal corporation need not be shown, but may be presumed. ‘ Public injury and mis *927 chief ’ has a broader concept than mere loss to the municipality in dollars and cents. (Altschul v. Ludwig, supra; Hathaway v. City of Oneonta, 148 Misc. 695; Blanshard v. City of New York, 141 id. 609, 612.) ” (American La France & Foamite Corp. v. City of New York, 156 Misc. 2, 4, affd. 246 App. Div. 699.)
After hearing the witnesses and examining the proofs the court is satisfied that the witnesses of the defendant were evasive and contradictory. They were so lacking in candor as to inspire more than suspicion that their disinterest in plaintiffs’ product was not altogether related to its quality or ability to do the job desired. The conclusion is reached that inadequate thought, if any, was given to the fact that the present plan is experimental only and involved a very minor expenditure by the city in the light of the extent of meter parking if fully applied and its attendant cost. In this prospective view, the interest of the city at large would be served, it would seem, in enlarging the experiment to include the use of every reasonably available device that has a measure of adaptability which defendants have conceded to plaintiffs ’ product.
Plaintiffs had manufactured its product for four years. They did not have 500 units in successful operation for three years. The exact figures do not appear but they have several thousand twin meters in operation in over 100 communities throughout the United States. They have the preponderant proportion of meters installed in Detroit where defendant Reid was employed during the period when installation was there under consideration. Apart from the question of the degree to which Detroit is comparable to New York City, since insinuation was made in this connection, defendants should have been anxious to inquire and to develop why in that city a two-year manufacturing qualification was considered adequate although at that time plaintiffs only had one year of manufacturing experience, and, furthermore, how it came to pass as plaintiffs endeavored to establish that their meter was finally installed.
Defendant Reid was aware of plaintiffs ’ product. The defense witnesses disagreed on the question whether plaintiffs had submitted a sample product. They demonstrated considerable lack of knowledge of its mechanism or distinterest in it entirely. This, they explained, because it was decided a single-space meter was to be used. To support this judgment an enlarged map and blueprint of one side of Livingston Street between Hoyt and Smith Streets in Brooklyn as a typical situation was presented. The hedging and evasion on the meaning of typical was itself damaging. The use of this street was misleading. But even in this difficult situation, one which indeed the court may well note *928 is unusual and difficult, the defendants conceded some twin meters can be used. In fact, the opposite block, it was shown by plaintiffs, was available for contiguous parking and defendants did not claim that it could not be metered solely by twin meters.
Defendant Splain testified experience justified the specifications and that they were traditional. He had nothing to do with the selection of the meter. The specifications, otherwise, were however his responsibility and drawn under his supervision. He claimed plaintiffs were not prevented from bidding and if their bid showed less than five years’ manufacturing experience and less than three years’ successful operation of the specified number of units, it could be considered an informality that is waivable. On cross-examination he stated the defendant Reid was associated with him on drawing all the specifications complained of. Finally this witness wavered on the question of the nature of informality and the waivability and the extent of the authority of this defendant to waive. He had also claimed the double meter was not tested because none was submitted.
The Director of Traffic Planning testified the surveys showed the single space meter was best suited to do the job. But he also testified ‘‘ we are fortunate to find long strips of parking spaces where we can take effective advantage of any twin meter ”. He would, however, prefer to use single meters in all applications. His testimony was offered to demonstrate, particularly, the advantages of the single-space meter. There was, however, complete failure to establish any clear superiority whatever. On the contrary, were each block available for contiguous parking the twin meter, it seemed, would be supreme in its every advantage, and its advantages were shown to be many. In such a situation it would be grossly arbitrary, unreasonable and wasteful to exclude the twin meter from bidding.
It is not necessary, however, that such a situation obtain to reach the same conclusion and particularly in the light of the remaining circumstances here. With such a measure of usefulness conceded, it is highly improper at this experimental stage to exclude from such experimentation the testing of a device which commends itself so highly and has won at least some grudging approval from the defendants’ witnesses. In the light of the testimony of defendant Splain that a bid must be low, formal and responsible to be accepted and may be investigated on submission and informalities waived, of the testimony of defendant Reid that he collaborated with defendant Splain on all the specifications, and in the light of defendant Reid’s special knowledge in the field and his responsibility to know of plain *929 tiffs’ product and qualifications, the proposal should not have excluded the possibility of a formal bid from plaintiffs on any score.
Defendant Reid’s testimony was not altogether comprehensible. For instance he stated:
“ Q. The flexibility is of importance, isn’t it, only where there is a coincidence in the appearance on a street of an obstruction such as a light pole or a utility pole or a mail box or something else, some sort of obstruction on the street? That is where you have to be concerned with this so-called flexibility, isn’t that right? A. I would like to answer questions, but I simply don’t understand that as a question. * * *
“ Q. And I have asked you now, sir, whether in the use of the word flexibility you are referring to the difficulty, or possible difficulty in an occasional instance where there may be a conflict between the installation of a meter and a sidewalk obstruction, so-called? A. That is right. * 51 ”
This type of hesitation was frequent. Again he testified:
“ Q. Yes. It was your intention through these specifications to eliminate the twin meter from the bidding, was it not? A. No, it was not.
“Q. Oh, you intended to use the twin meter, did you? A. I didn’t intend to use any meter by name. I intended to use the meter that could meet the specifications.
“ Q. Well, you knew that the twin type meter would not meet the specifications, didn’t you ? A. I did not, no.
“ Q. So you didn’t know what meters would meet the specifications, is that right? A. That is right.
“ Q. So you drew the specifications without knowing what meters would meet those specifications, is that correct? A. The trade names, yes, that is correct.
“ Q. I am not talking about trade names. I am talking about types now, sir. Did you draw these specifications so as to eliminate the twin type meter? A. Yes.”
He further admitted, after some hesitation, that he had a hand in the fixing of the five-year and three-year specifications. The latter was intended as a basic period of testing for climatic conditions in New York City although he stated that no other area had similar climatic conditions. It is not clear therefore just how any period of successful operation elsewhere could serve as an objective standard for use in New York City. The considerable expenditure to which the city would be put eventually if meter parking was to be utilized to its fullest extent; the lack of experience in this field; the obvious advantages of plaintiffs ’ product to do, at least, a major portion of the full ultimate job at manifold possible savings as claimed; the defendant Splain’s assertion that informality can be waived; the utter lack of showing of any marked degree of superiority of the single-space meter, particularly, in the light of the prospective and not the immediate job to be done; the information concerning available products and qualifications which should be within the knowledge of defendant Reid, should have dictated the preparation *930 of a proposal that would enable the plaintiffs’ product to be bid in the interest of testing this new device (Warren Bros. Co. v. City of New York, 190 N. Y. 297), as well as those longer in the field and in the interest of greater certainty of efficiency and economy. Indeed, defense counsel agreed that plaintiffs could not offer a bid under the present proposal and consequently, the sole question was the reasonableness of the specifications. Furthermore, it was the testimony of the defendant Splain that when the matter was first presented he did not know one manufacturer of parking meters whom the restrictions would adversely affect. Furthermore, he and defendant Reid were not, at all times, consistent in fixing the responsibility for arranging the specifications. Yet defendant Reid who finally claimed á hand in the five-year and three-year specifications and selected the single-space meter must have known all the makers and their qualifications and how the specifications would affect them. In fact, in December, 1947, defendant Reid, then City Traffic Engineer in Detroit, had indicated, in writing, to plaintiffs that their bid could be submitted and would be considered. That was in connection with meter parking in Detroit and plaintiffs endeavored.to establish that defendant Reid played a part in fixing the manufacturing experience requirement then at two years, at which time plaintiffs had but one year of manufacturing experience, He declared then plaintiffs’ product was new and untried. Now plaintiffs have four years of manufacturing experience and wide distribution of several thousand units, including several in Detroit.
Obviously, the purpose of the present experiment in traffic regulation through meter parking is to determine whether it is feasible, and if so, to give to the city the finest possible system and planning. It can hardly amount to a thorough experiment at this early stage of relatively minor expenditure from which the maximum amount of know-how will be derived if plaintiffs’ product of attractive possibility is eliminated. Moreover, the Director of Traffic Planning agreed that if enough of any meter is used, the job can be done satisfactorily even if the use of the twin meter and plaintiffs’ left-hand and right-hand adapted single meters are needed in combination.
It is, in addition, quite likely that when the period of experiment is over plaintiffs will have arrived at the point of five-year manufacture and three-year successful operation. In these circumstances waste is possible if plaintiffs are excluded from bidding in competition with other products not shown to be superior. Having failed to establish the requisite superiority of the single-space type meter over plaintiffs ’ product, the defend *931 ants have likewise failed', in the circumstances here,, to establish any reasonable justification for the exclusion ■ of plaintiffs’ product through the specifications contained in the proposal.
I find accordingly for the plaintiffs.