Abraham J. Gellinoff, J.
The petitioners in this article 78 proceeding are various individual merchants, many with premises on Madison Avenue in the Borough of Manhattan, New York City, and organizations of such merchants. They seek to restrain respondents, the Mayor of the City of New York and his department heads, from creating a Madison Avenue Mall without the approval of the Board of Estimate of the City of New York.
Currently, Madison Avenue in the midtown area is a retail store and office building center, occupied by prestigious establishments and offices of important commercial enterprises. The avenue is 80 feet wide from building line to building line, with a 54-foot roadway, accommodating four lanes of vehicular traffic, surrounded by two 13-foot wide sidewalks.
Respondents propose to convert Madison Avenue from 44th Street to 57th Street into a mall. The construction of the mall would entail widening the sidewalks to an aggregate width of 58 feet, and narrowing the roadway to 22 feet, thereby accommodating only two lanes of traffic. Although through traffic on the various side streets would be permitted to pass across Madison Avenue, all private vehicles would be banned from driving along the avenue itself. Only city-owned buses and emergency vehicles would be permitted on the two-lane roadway; and truck deliveries would be permittted only at specified hours, on the west side of the mall. On the expanded sidewalks, respondents plan to erect benches, trees, bus stop platforms and information kiosks.
By constructing the mall, respondents intend to create “ a new type of shopping environment ”. They assert that the bulding of the mall will enable the midtown area to compete for customers with “ suburban shopping malls ” by ‘ ‘ providing unimpeded strolling and sitting space, tree-shaded relief from the concrete of the City, a largely traffic-free shopping area, reduced noise and air pollution, and other amenities necessary to spark a renewed interest in downtown shopping ”.
. Petitioners, however, do not share this optimistic projection. They allege that “it is the considered opinion of sub *113 stantially every leading merchant in the midtown area, based upon careful surveys and an intimate knowledge of the factors involved, that the construction of Madison Mall will he ruinous to their business ”. Petitioners contend that “unless prevented by this Court one of the main North-South arteries of traffic in the most important midtown commercial area of Manhattan will be effectively cut, diverting traffic to already overburdened 5th Avenue, 6th Avenue and 3rd Avenue and resulting in severe and drastic damage to petitioners and their members, depriving them and the general public of proper access to their premises * * * and transforming what is now a successful business street into a commercial disaster area * * * destroying the quiet and dignity of the area and transforming it into a carnival and street-fair area, causing massive tie-ups of traffic on adjacent North-South and on cross-town arteries in the midtown section * * * necessitating the diversion of large numbers of the already depleted and undermanned police force of the City from other areas of the City in an attempt to cope with such anticipated traffic tie-ups; wasting limited fiscal resources and diverting them from vitally necessary and proper purposes to unnecessary and improper purposes; all to the severe damage and prejudice of the petitioners — all of whom are taxpayers — and to the damage and prejudice of all other taxpayers and residents of the City”.
Under the City Charter, the Board of Estimate has “ control of the streets of the city, except as in this charter otherwise provided ” (New York City Charter, § 362). Respondents contend that it is “ in this charter otherwise provided ”. They point to subdivision 3 of section 2103 of the Charter, which provides that the Transportation Administration — appointees of the Mayor — “ shall have the following functions with respect to the construction, maintenance and repair of public roads, streets, highways, parkways, bridges and tunnels:
“(a) regulating, grading, curbing, flagging and guttering of streets, including marginal streets and places and laying of crosswalks;
“(b) designing, constructing and repairing of public roads, streets, highways and parkways;
“(c) paving, repaving, resurfacing and repairing of all public roads, streets, including marginal streets and places, highways and parkways and relaying of all pavements removed for any cause ’ ’.
Respondents claim that the ‘ ‘ function ’ ’ which section 2103 (subd. 3, par. [b]) delegates to them with respect to the *114 “designing ” of streets authorizes them to create the mall. The word “designing” in subdivision 3 of section 2103 takes color from the words surrounding it, and must be construed in the context in which it is used (Matter of Hurlibut, 180 Misc. 681 [Surr. Ct., N. Y. County, 1943]; Wakefield v. Fargo, 90 N. Y. 213 [1882]). Here, the language surrounding the word “designing” includes the words “ constructing ”, “repairing ”, “ curbing ”, “ paving ”, “ repaving ”, “ guttering ’ ’ and words of similar import. Construed as a whole, the sense of subdivision 3 of section 2103 is to empower the Transportation Administration to make those common, ordinary changes in the city’s streets, roadways, highways and parkways as may be necessary to keep them in good repair, and to maintain and facilitate their day by day operation. Indeed, the introductory clause of subdivision 3 of section 2103 itself epitomizes the powers granted therein, by describing them as ‘ ‘ functions with respect to the construction, maintenance and repair of the public roads ”,
The word “designing” therefore, construed in the context of subdivision 3 of section 2103, as it must be, means the planning of the dimensions or other physical aspects of the streets as may be required for their “ construction, maintenance and repair” in order to keep the transportation facilities of the city in good working order.
Respondents intend, however, not just an alteration in the width of the sidewalks and roadway of Madison Avenue in the ordinary course of ‘ ‘ the construction, maintenance and repair ” of the public streets, nor merely the regulation of traffic pursuant to section 2103 (subd. 1, par. [b]) of the Charter. Respondents affirmatively assert that they intend, by means of the mall, to transform Madison Avenue into a ‘ ‘ new type of shopping environment ’ ’, comparable to suburban shopping centers. To change the long-existing, intrinsic character and nature of a major thoroughfare goes well beyond the mere ‘£ designing ’ ’ of streets. Such a drastic transmutation of the very heart and soul of Madison Avenue — not only of its physical but also of its economic core — requires the exercise of powers over the city’s streets that greatly exceed the power to plan the dimensions or other physical aspects of the streets. The use of the word ‘ ‘ designing ’ ’ was never intended to extend that kind of power to the Transportation Administration.
This conclusion is confirmed by the available legislative history. Prior to its revision in 1963, the City Charter, as does the present Charter, vested in the Board of Estimate “ control *115 of the streets of the city, except as in this charter otherwise provided ” (Former New York City Charter, § 362 [1938]). It was “ otherwise provided” in that Charter that the various Borough Presidents have control:
“(1) Of regulating, grading, curbing, flagging and guttering of streets and laying of crosswalks.
“(2) Of constructing and repairing public roads.
“(3) Of paving, repaving, resurfacing and repairing of all streets, and of the relaying of all pavements removed for any cause.” (Former [1938] New York City Charter, § 82, subd. d, pars. [1], [2], [3].)
Pursuant to its “control of the streets of the city”, the Board of Estimate, in 1926, passed a resolution specifying a formula for fixing the width of the roadways and sidewalks of all the streets of the city. The respondents have conceded —here, and in other proceedings (see Corbett v. Sidamon Eristoff, N. Y. L. J., June 17, 1971, p. 16, col. 7 [Sup. Ct., N. Y. County, 1971]) — that the 1926 resolution was valid, notwithstanding the Borough Presidents’ control of “ constructing and repairing ” the streets.
In the revised Charter, the only change made in the description of the powers granted the Borough Presidents under the former Charter with respect to the streets, was the addition of the word “ designing ” in the description of the powers granted the Transportation Administration under the revised Charter. Thus, where the Borough Presidents formerly had control of “ constructing and repairing ”, the Transportation Administration now has control of ‘ ‘ designing, constructing and repairing” (cf. former. City Charter, § 82, subd. [d], par. [2]; [1938], with present City Charter, § 2103, subd. 3, par. [b], as added by Local Laws, 1969, No. 67). The Report of the Charter Revision Commission, which accompanied the revised Charter, states under the heading “ The Borough President”: “Jurisdiction over highways and sewers to be transferred i to a new Department of Highways and Sewers [the predecessor of the Transportation Administration].” This shows that the already existing powers were merely to be “ transferred ”, and there is no indication whatever that the addition of the word ‘ ‘ designing ’ ’ was intended to expand such powers in any respect.
In summary, then, based on a construction of the language of the applicable Charter provisions, and an analysis of the legislative history of those provisions, the court concludes that the Transportation Administration lacks authority to make the *116 monumental changes in the physical and economic existence of Madison Avenue contemplated by the proposed mall. Since the Charter does not vest the necessary power elsewhere, section 362 of the Charter mandates that such power remain with the Board of Estimate.
Accordingly, the petition is granted.