Sidney H. Asch. J.
This action is brought by plaintiffs for a judgment declaring illegal certain administrative actions taken by both the Administrator of Transportation (formerly Commissioner of Highways) and the Commissioner of Purchase of the City of New York, and enjoining the continued implementation thereof by such officials and their successors.
The action taken by the Administrator of Transportation, commencing in July, 1968 was to issue a directive requiring that in all Highway Department paving contracts involving night work, no asphalt plant be operated between the hours of 9 p.m. and 6 a.m. unless such plant was located in an area of M-3 zoning.
The Commissioner of Purchase adopted substantially the same restriction and, commencing in May 1972, required as a condition of all contracts for the purchase of night asphalt for delivery into city trucks after 9 p.m. that the contractor’s plant be located in an M-3 zone.
Plaintiff Metropolitan is engaged in the business of manufacturing asphalt paving mixtures and is a subsidiary and affiliate of plaintiffs Grace and Edenwald.
Plaintiffs Grace and Edenwald, which are paving contractors, created Metropolitan for the purpose of supplying almost all of their asphalt requirements. All three plaintiffs are recognized suppliers and contractors for the City of New York *713 and have successfully bid upon, been awarded and satisfactorily completed contracts for the city.
Plaintiffs’ plant facilities are located at 155-45 6th Road, Whitestone, New York, which is now designated a M-l zoning district. The plant was constructed in 1953 in accordance with zoning then in effect and its use for the production of asphalt on a night and day basis was (and continues to be, under the M-l zoning designation given plaintiffs’ area under the later zoning ordinance of December, 1961) a permissible use. Plaintiffs have produced and delivered asphalt on a night and day basis since 1953 in the ordinary course of their business.
Prior to July, 1968, the Administrator of Transportation (then Commissioner of Highways) received complaints from residents and citizen groups in the vicinity of plaintiffs’ plant regarding nighttime noise resulting from the operation of plaintiffs’ plant and truck traffic to and from such plant.
As a result of such complaints, in July, 1968 the then Commissioner of Highways, on his own initiative and judgment, issued a directive that in the performance of Highway Department contracts between 9 p.m. and 6 a.m. deliveries could be made only from plants located in an M-3 zone.
The Commissioner of Purchase adopted the judgment of the Commissioner of Highways and starting in May, 1972 a substantially similar restriction was, and continues to be, inserted in Department of Purchase contracts.
Such decisions by the commissioners were made by reason of the local residents’ complaint directed at plaintiffs’ night operations and were designed with the knowledge that of the various asphalt plants in this city, only Metropolitan’s plant was in an M-l zone while all others were in an M-3 zone.
No allegation is involved in this proceeding of excessive or illegal noise, or noise other than that concomitant to the ordinary operation of plaintiffs’ facilities. No notice or hearing was given plaintiffs prior to the directives issued by the commissioners.
It will be noted from Exhibit A-l attached to the stipulation of facts that the M-l district in which plaintiffs’ plant is situated is surrounded by R-2, R-3 and R-4 residential districts created under the later 1961 zoning ordinance, and that plaintiffs’ vehicles must by necessity pass through such mixed residential areas in order to reach their destinations.
Exhibit B attached to the stipulation of facts shows (to the *714 extent relevant to the legal issues involved) that plaintiffs’ asphalt plant is located a distance of 357 feet from its closest outside wall to the nearest street. It is more than 445 feet to the nearest "dwelling” which is a combined bar and residence. The distance to the next residence (as noted on the truck route outlined on Exhibit B) is substantially further although not measured on Exhibit B.
The Department of Highways has substantially reduced the night paving contracts it has awarded. That is primarily due to the fact that night paving is being performed by the city’s own forces either with city produced asphalt or through purchases of night asphalt from private producers such as Metropolitan.
Thus, since May, 1972, when the Department of Purchase started placing its restrictions as to an M-3 zone in its night asphalt purchase contracts (even including its estimated contracts to June 30, 1974), one finds a total of $13,102,445 in contracts. Of that total, $6,328,750, or 48.30% of all contracts are night supply contracts from which the city has excluded Metropolitan.
Specifically, so far as this action is concerned, Metropolitan’s bid for a Department of Purchase letting of May 31, 1972, was $50,000 below the next bidder. However, it was not awarded the contract (which was awarded to the second bidder) solely because its plant was not in an M-3 zone.
Thereafter, Metropolitan was the low bidder in another letting on April 19, 1973, by the sum of $96,900. Again, it was not awarded the contract (which was awarded to the second bidder) solely because its plant was not in an M-3 zone.
Under contract M-67-23 let by the Department of Highways, Edenwald was the low bidder and, although it received an award of contract, it was prevented from using Metropolitan’s facilities for the supply of asphalt between 9 p.m. and 6 a.m.
Two agreed facts stand at the fore. First, the actions of the agency heads resulted from the complaint of certain residents in the area of plaintiffs’ plant regarding noise arising out of plaintiffs’ operations only, and not out of the operation of any other asphalt producer. Second, all of the asphalt producers, with the exception of Metropolitan, have their plants in an M-3 zone.
There has been no serious denial (although perhaps a glossing-over) by defendants that the actions of the agency heads *715 were aimed directly at plaintiffs, and no others, and were designed with a view to curtailing night operations of the Metropolitan plant.
Unfortunately, and praiseworthy as the purpose may be, such actions by the agency heads are illegal as beyond the scope of their power and authority.
The basic power of the heads of city agencies is found in section 1105 of the New York City Charter, which provides as follows:
"a. Each head of an agency may, except as otherwise provided by law, make rules and regulations for the conduct of his office or agency and to carry out its powers and duties.”
The "power to make rules and regulations,” however, as the Court of Appeals has told us is, "administrative, not legislative” (Acorn Employment Serv. v Moss, 292 NY 147, 153). Thus, an agency head may make rules (also subject to certain restrictions) to carry out the express function of his agency as conferred by statute, but he may not, even to promote the public good and welfare, create policy and encroach on legislative functions.
It may well be that the agency heads in this case were of the opinion that their actions promoted the welfare of the citizens in the area of plaintiffs’ plant by reducing nighttime noise. But, an examination of the powers given to the heads of the Transportation Administration and the Municipal Services Administration under the New York City Charter, as well as an examination of the cases in similar actions, unquestionably establishes that such agency heads have exceeded their powers.
In the case of Matter of Natilson v Hodson (289 NY 842), the Commissioner of the Department of Welfare promulgated rules which prohibited any employee from engaging in any other occupation, profession or business while an employee of the Department of Welfare. Although such rule was directly concerned with the internal operation of the Department of Welfare, the Court of Appeals held that the commissioner exceeded his powers.
Two cases strongly parallel to the present one are Matter of Small v Moss (279 NY 288, 295) and Matter of Goelet v Moss (248 App Div 499, affd 273 NY 503). In issue in the Small case was whether the license commissioner, who was empowered to issue licenses for the operation of theatres, including (p 298) *716 "the power to pass upon the location of the theatre,” could deny a license for a theatre on the ground that the theatre proposed would bring increased traffic and create a traffic danger for travelers in the street. The Court of Appeals unanimously held that the commissioner could not deny such license. The following quotation from the court’s opinion in that case illustrates the reasoning of the court (pp 295-296): "The question is not whether the Council might confer such power upon the Police Department or even upon the Commissioner of Licenses with appropriate directions for its exercise. The question before us is the narrow one: whether in fact such power has been conferred upon the Commissioner.
"Certainly there is nothing in the provisions of the charter itself which indicates any intention to confer such power upon the Department of Licenses. A property owner ordinarily has a 'right of access from the street to his premises for convenience, pleasure, or business.’ (Matter of Larkin Co. v Schwab [242 NY 330,] 338.) He may expect the city to preserve and protect that right by reasonable traffic regulation, by proper street lighting, and even, where practicable, by change or contour of the street. In spite of well-planned and well-executed measures directed to that end, some streets will still be unsuited to heavy traffic, and some points will present peculiar traffic dangers. A legislative policy * * * which would not attract large numbers of automobiles or increase traffic dangers might promote the public welfare; but no such legislative policy has been adopted, and we do not consider now what laws, if any, could validly be enacted to make such a policy effective.”
In the Goelet case, the same Commissioner of Licenses had refused to issue a license for the construction of a theatre on Park Avenue, between Fifty-third and Fifty-fourth Streets after various property owners in the neighborhood had complained that a theatre would depreciate real estate values. The court reversed Special Term, granted mandamus to the petitioner and held the following (pp 500-501):
"We hold that the Zoning Law is the controlling authority as to what uses the owners may make of their property in a given district. That law takes into consideration the property values in the district and the uses to which the property may be put. Whether the erection of a theater in a space which has been left free by the law for such purposes would depreciate property values is not a matter of concern of the commis *717 sioner of licenses of the city of New York. As was said in Matter of Larkin Co. v Schwab (242 NY 330): 'In considering the power to issue a mandamus order for license, permit or consent, the courts must take into consideration the limits of the discretion which under the statute or ordinance is vested in the administrative body. Refusal to grant a permit must be considered arbitrary where based solely upon grounds which under the statute the administrative body may not consider.’
"The effect of the act of the commissioner of licenses in this case is to interfere in the administration of the zoning laws and ordinances. The decision below grants a negative and discretionary exception upon the law.”
How is the present case any different from the Small and Goelet cases? Here, the two agency heads, (for the supposed welfare of the inhabitants of later designated residential areas which surround plaintiffs’ manufacturing district) promulgated a regulation to exclude the use of Metropolitan’s plant from City of New York asphalt paving and purchase contracts, despite the fact that the night operation of such plant and the truck traffic flowing therefrom are completely legal. Do these agency heads have broader powers than the Commissioner of Licenses? An examination of the appropriate sections of the City Charter shows they do not.
The relevant sections of the New York City Charter are those setting forth the "Powers and duties of the administrator” (City Charter, § 1602 as to the Municipal Service Administrator, and § 2102 as to the Transportation Administrator) and the "Functions of the administration” (City Charter, § 1603 as to the Municipal Services Administrator and § 2103 as to the Transportation Administrator). Nowhere in the reading of such sections can one find either an express or implied power on the part of either agency head to concern himself with noise abatement or, for that matter, with general good and welfare. Certainly the sections devoted to Public Works and Purchase Contracts contain no authorization to utilize the device of contractual restrictions to further the individual judgments of the agency heads in areas having nothing whatever to do with their general powers and functions.
In fact, subdivision 1 of section 2103 on the subject of traffic directs the Administrator of Transportation:
"(g) to make recommendations to the mayor in regard to methods of ameliorating traffic conditions which adversely *718 affect the welfare of the city and which cannot be remedied by traffic rules or regulations;
"(h) to submit to the mayor from time to time for consideration and forwarding to the appropriate city agencies, specific proposals for amendment of the resolutions, rules and regulations of city agencies which affect traffic conditions in the city, and proposed legislation which may be necessary to implement and effectuate such proposals”.
It is plain that the Administrator of Transportation has no power himself to alleviate such conditions but only the power to make recommendations.
Two recent cases striking down the Transportation Administrator’s attempts to act beyond the power granted him under the City Charter convincingly demonstrate the boundaries of such power.
The first case is Fifth Ave. Assn v Lindsay (73 Misc 2d 111, affd 41 AD2d 1031). In that case the Mayor and the Transportation Administrator sought to convert Madison Avenue from 44th Street to 57th Street into what was described as a "mall”.
The City Charter provides that the Board of Estimate has "control of the streets of the city, except as in this charter otherwise provided” (New York City Charter, § 362). The Mayor and the Administrator contended that the Charter "otherwise provided” in that subdivision 3 of section 2103 gave the Administrator the power of "designing” streets.
The Appellate Division, First Department, unanimously affirmed the holding of Special Term that the power to make such fundamental and policy changes rested with the Board of Estimate and not with the Administrator of Transportation.
The second case is Brooklyn Union Gas Co. v New York City Transp. Administration (NYLJ, Sept. 7, 1973, p 2, col 2). There, the same Administrator published rules prohibiting construction on certain streets between 7 a.m. and 7 p.m. The New York City Noise Control Code (Administrative Code, § 1403.3-1.01 et seq.) however prohibits construction except between 7 a.m. and 6 p.m. The court granted a preliminary injunction restraining enforcement of such rules pending trial and noted:
"The court finds it hard to understand defendant’s posture that it has the right, in the name of the public good, to *719 exercise Police Power which can change entirely the functioning of every public utility in this city.”
Other cases further illustrate that the court will strike down any attempt by a city agency head to create policy which is a legislative function and not an administrative one.
In Thrift Wash v O’Connell (11 Mise 2d 318) the Commissioner of Licenses issued a regulation requiring laundromats to have an attendant on duty. The court rejected the idea that the commissioner had any such power and wrote (p 322): "Furthermore, the question of whether regulation 20 is a reasonable and necessary requirement for the safety and convenience of the public is not an issue here. Such power as the city has to protect property and care for the safety, health, comfort and general welfare of its inhabitants is vested in the City Council, not in the commissioner of licenses or other administrative officers. (General City Law, § 20.) However reasonable and necessary the commissioner’s regulation may be, it was not authorized by the provisions of article 23 or any other legislative enactment. In adopting a rule that was neither expressly nor by implication an incident to legislative authority, he has exceeded his power and the regulation is invalid. (Matter of Natilson v. Hodson, 289 N. Y. 842, 843; Matter of Small v. Moss, 279 N. Y. 288, 295; Matter of Executive Service Corp. v. Moss, 256 App. Div. 345, 347.)”
In Matter of Executive Serv. Corp. v Moss (256 App Div 345) the court held that the Commissioner of Licenses exceeded his powers in establishing a regulation requiring that before more than one week’s salary is exacted as a fee by an employment agency, there must be shown to exist a written contract between the employer and the employee. The court held (p 347): "The commissioner of licenses has no power to declare a legislative policy or to create standards with respect to the granting or exercise of a license. His duty is merely to apply the declared policy and the rules and standards laid down in statute and ordinance. To this in his field of discretion confined. (Matter of Small v. Moss, 279 N. Y. 288; Matter of Picone v. Commissioner of Licenses, 241 N. Y. 157; Matter of Larkin Co. v. Schwab, 242 N. Y. 330.)”
It may well be noted at this point that New York City has a very comprehensive "Noise Control Code” (Administrative Code, § 1403.3-1.01 et seq). The Noise Control Code has express provisions governing noise control under contracts with the *720 city (§ 1403.3-2.25) and restricting construction for all contractors between 6 p.m. and 7 a.m. (§ 1403.3-4.11).
All such provisions were enacted by legislation and are under the direction and control of the Environmental Protection Administration. Plaintiffs and all others will be held to the standards required.
Although plaintiffs’ excellent record of compliance with the Noise Code is not in issue before this court, the arbitrary regulations by the agency heads in this case is very much in issue. If a legislative policy enactment is necessary, a legislative method of accomplishment exists. If enforcement of existing law is necessary, proper methods for such enforcement exist. If routing of trucks by way of different streets is desired, a method to accomplish that is available. If a taking of plaintiffs’ property by eminent domain proceedings is desired by the city, procedure for that too exists.
However, there is no lawful means by which the heads of the Transportation Administration or the Municipal Services Administration can, by self-determined administrative action, step beyond the powers conferred on them by statute. The issuance by them of a regulation designed solely to restrict plaintiff is an arbitrary and illegal act.
The court in Matter of Kasper v O’Connell (38 Misc 2d 3, 5), summed up the general rule as follows: "An administrative agency is a creature of the Legislature. It possesses no inherent legislative power and must strictly confine the exercise of its delegated authority within the boundaries of the Legislature’s mandate. However much courts may defer to administrative expertise, they may not countenance action which patently contravenes the vires expressly laid down in the enabling statute; they may not 'sanction administrative lawlessness’ (Peters v. Hobby, 349 U. S. 331, 345). 'Administrative practice may not thwart a statute the purposes of which are as clear as those here involved.’ (Matter of Hines v. La Guardia, 293 N. Y. 207, 216; Matter of Walling v. Schechter, 7 NY2d 814); administrative adjudication may not employ a 'standard different from that fixed by the Legislature’ (Fuld, J., concurring in Matter of Barry v. O’Connell, 303 N. Y. 46, 53); an administrative regulation may not 'put into the body of the statute a limitation which [the Legislature] did not think it necessary to prescribe’ (Morrill v. Jones, 106 U. S. 466, 467; Acorn Employment Serv. v. Moss, 292 N. Y. 147; *721 Matter of Gross v. New York City Alcoholic Beverage Control Bd., 7 N. Y. 2d 531).”
Attention is also called to subdivision b of section 1105 of the Charter which provides in substance ..that no rule or regulation shall be adopted unless interested persons are afforded an opportunity to comment thereon in writing after due notice in the City Record. It is not to be denied that no such notice was published and that no opportunity was given to plaintiffs to be heard although they were the only ones affected by the rule.
It may be argued that the directives should not be considered a "rule or regulation.” That, however, would be semantic sophistry. Whether it be called a "directive” or be given any other name, they are regulations which have been and will continue to be binding effect in the issuance of all night asphalt contracts unless held otherwise by this court.
That this court should look to the substantive effect of a "directive” is accentuated by subdivision d of section 1105 of the City Charter which creates an exception to the requirement for a hearing for rules and regulations "(2) which relate to the organization or internal management of any agency and do not affect materially the rights of or procedures available to the public”. That exception is clearly not applicable here.
The actions of the agency heads, in addition to being beyond their powers as argued above, constitute an illegal restriction on competitive bidding and a waste of public funds. Section 343 of the City Charter which governs the public letting of contracts provides as follows:
"§ 343. Public letting — a. If the several parts of the work or labor to be done and/or the supplies, materials and equipment to be furnished shall together involve the expenditure of more than two thousand five hundred dollars, such work or labor or supplies, materials and equipment shall be obtained only by contract on public letting founded on sealed bids under such regulations as shall be made by the board of estimate, except that in a special case the board of estimate by a two-thirds vote may order otherwise. The terms of such contracts shall be settled by the corporation counsel as an act of preliminary specification to a proposal for bids.”
It is fundamental that the letting must be generally open to all responsible bidders to compete. In the generally accepted authoritative work, McQuillin on Municipal Corporations (vol *722 10, 3d ed., § 29.44) the author states the proposition as follows: "The request for bids must not unduly restrict competition. The dictates of public policy require that all responsible bidders shall have the opportunity to compete, and accordingly devices or unreasonable actions by authorities which are designed or tend to limit the list of qualified bidders are presumed to be injurious to the taxpayer and are illegal. All parties having the ability to perform the advertised contract should be allowed to compete freely without any unreasonable restrictions.”
The facts establish, in the light of such general proposition of law and an examination of some of the leading cases decided thereon, that there has been an illegal restriction on competitive bidding.
To begin with, all of the plaintiffs are recognized to be qualified and responsible bidders who have successfully completed contracts for the city and no issue exists with respect to that matter.
Furthermore, although Metropolitan was the low bidder on proposed contracts let on May 13, 1972 and April 19, 1973, respectively, the contracts were awarded to the second bidder solely because defendants had placed a restrictive clause in the bidding documents (aimed directly and solely at the Metropolitan plant) requiring that the supplying asphalt plant be located in an M-3 zone.
The failure to award those contracts to Metropolitan resulted in a waste of public funds of $153,900 based on the bid prices.
A municipality letting a contract may, of course, fix proper standards or limitations in its proposal for bids which bidders are obliged to observe. Thus, it may establish reasonable restrictions as to the kind and quality of material to be used (Meyers v Pennsylvania Steel Co., 77 App Div 307); may require certain reasonable standards of experience or adequate plant facilities (Berghoffen v City of New York, 31 Misc 205; Meyers v City of New York, 58 App Div 534); and may, no doubt, place other reasonable restrictions.
But, a municipality may not, directly or indirectly, design the specifications so as to shut out or reduce competitive bidding. Thus, the Court of Appeals in Matter of McNutt Co. v Eckert (257 NY 100, 104) wrote as follows: "If the Board of Education had violated subdivision 8 of section 875, as above quoted, by awarding a contract for school furniture in excess *723 of $1,000 without advertising for estimates, the contract would be illegal. If it had accomplished the same result by indirection, that is, had so fixed or manipulated the specifications as to shut out competitive bidding or permit unfair advantage or favoritism, the contract likewise would be illegal (Brady v. Mayor, 20 N. Y. 312; Bigler v. Mayor, 5 Abb. N. C. 51). The principle underlying the law relating to the public letting of contracts through advertisement is stated by Dillon in his work on Municipal Corporations ([5th ed.], vol. 2, § 807) as follows: ’When by charter or statute a municipality can only let its contracts to the lowest bidder after advertisement, an implied condition and restriction is placed upon the proceedings of the municipality that the various steps adopted by it to let a contract shall be of such a nature and taken in such form as in good faith to invite competition. * * * The plan and specification are essential to competitive bidding because it is only through their agency that there is a reasonable assurance that all bidders are competing upon the same basis and without favoritism and that no fraud enters into the award.” ” (Emphasis supplied.)
It is almost self-evident that if specifications are drawn so as to assure the award of contract to a specific bidder or to shut out competitive bidding or permit favoritism, then a fatal defect exists (Gerzof v Sweeney, 16 NY2d 206; Matter of General Bldg. Contrs. of N. Y. State v City of Syracuse, 40 AD2d 584; Matter of McNutt Co. v Eckert, 257 NY 100, supra; Grace v Forbes, 64 Misc 130; American La France & Foamite Corp. v City of New York, 156 Misc 2; International Meters v City of New York, 47 Misc 2d 924).
In Gerzof v Sweeney (16 NY2d 206, supra), the Court of Appeals, reversing both Special Term and Appellate Division, found that the specifications for the installation of certain equipment for the Village of Freeport were of a distinctive design customarily employed by only one prospective bidder and directed that judgment be entered to annul the award of contract.
The applicable rule of law was set forth by the court in Gerzof v Sweeney as follows (pp 209, 211-212):
”If a municipality awards a contract without advertising for bids, when required, the contract would, concedly, be illegal. And, as this court pointedly remarked in Matter of McNutt Co. v. Eckert, 257 N. Y. 100, 104), ’the contract likewise would be illegal’ if the municipality ’had accomplished the same *724 result by indirection, that is, had so fixed or manipulated the specifications as to shut out competitive bidding or permit unfair advantage or favoritism’. (See, also, Smith v. Syracuse Improvement Co., 161 N. Y. 484, 489-490; Grace v. Forbes, 64 Misc. 130, supra.)
"The record fails to explain or justify inclusion in the specifications of a distinctive design customarily employed by but one prospective bidder. Other manufacturers could, of course, construct the machine but only at a prohibitive cost and, hence, not at a competitive price. In a very real sense, and for all practical purposes, the competitive bidding required by the statute was effectively eliminated. Indeed, this impermissable result was assured by the specification requirement that the successful bidder must have had successful operating experience with at least three similar units. Such a scheme or plan is illegal in the absence of a clear showing that it is essential to the public interest. (See Matter of McNutt Co. v Eckert, 257 N. Y. 100, 107, supra; American La France & Foamite Corp. v. City of New York, 156 Misc. 2, 4, affd. 246 App. Div. 699, supra.) No such showing was made here. In fact, as indicated above, the defendants elected to have the case decided without submitting any opposing evidence.”
In Grace v Forbes (64 Misc 130, supra), the specifications for a central fire alarm system were so drawn as to limit the possibility of successful bidding to only one company. The court granted a competitor’s taxpayer application to restrain the award of contract and held as follows (p 136):
"If I am right in my construction of the specifications, if, in fact, they limit the opportunity for bidding to the Gamewell company, they fail utterly to comply with the statute. The statute requires an opportunity for competition; and, where this opportunity is given in form only and not in fact, its spirit is violated.
"The statutes which require public works to be let by contract and to the lowest bidder are enacted in the public interests; they are a bar against fraud, and they should receive from the courts the most liberal and fair interpretation.”
In the case of American La France & Foamite Corp. v City of New York (156 Misc 2, supra) specifications for fire apparatus were prepared with the equipment of two manufacturers in mind. The city officials attempted to justify this limitation *725 (which was not expressly stated in the specifications) by asserting that in the judgment of the responsible officials a particular type of apparatus represented the most efficient, modern and best adapted apparatus for controlling fire. The court nonetheless held the letting to be illegal and granted the plaintiff injunctive relief while making the following comments (p 4):
"It is implicit in section 419 of the city charter that the specifications be drawn so as to invite free and open competition. (Matter of McNutt Co. v. Eckert, 257 N. Y. 100; Dillon Muni. Corp. [5th ed.] § 807.) 'All persons or corporations having ability to furnish the supplies or materials needed, or to perform the work to be done, should be allowed to compete freely without any unreasonable restrictions.’ (McQuillin Muni. Corp. [2d ed.] § 1301.) While the court may not substitute its judgment for that of the responsible officials charged by law to act, in the absence of fraud, corruption, or bad faith (Talcott v. City of Buffalo, 125 N. Y. 280; Ziegler v. Chapin, 126 N. Y. 342; cf. Brockway Motor Truck Corp. v. City of New York, 145 Misc. 693, 698), where there is no clear showing that the particular product specified is so far superior as to require its exclusive use in order to meet performance requirements desired, the agents of the city are not justified in, and will be enjoined from, restricting bids to that product in exclusion of all others. (See Warren Brothers Co. v. City of New York, 190 N. Y. 297, 309.) For in these circumstances the intentional arrangement of specifications so as to shut out competitive bidding, whatever the motives may have been, renders that act illegal (Matter of McNutt Co. v. Eckert, supra, at p. 107).” (Emphasis supplied.)
In the Gerzof, Grace and American La France cases (supra) the specifications were resigned to limit the bidding to one or two bidders. In the present case the design is to allow all bidders except the plaintiffs. Does that distinguish the two situations in principle? It is clear that it does not.
The courts have long recognized that agreements to restrict or eliminate competitive bidding on public contracts are void as against public policy (Atcheson v Mallon, 43 NY 147; Unity Sheet Metal Works v Louis Supran, Inc., NYU, Oct. 13, 1944, p 866, col 7) and it can be no different when the device is created by the head of a municipal agency.
Defendants’ principal point is that the city may impose conditions upon those with whom it enters into contracts. *726 When such principle is stated as an abstraction, divorced from specific circumstances which give rise to questions of legality, then no disagreement is necessary or possible.
Defendants cite three United States Supreme Court cases in support of their position. These cases are (Perkins v Lukens Steel Co., 310 US 113; Ellis v United States, 206 US 246; and Atkin v Kansas, 191 US 207).
The Perkins case held that the plaintiff was without standing to contest the right of the labor secretary to determine "locality” under the public contracts act. The act required contractors of the Federal Government to pay not less than the minimum wage.
The court in the Ellis case (as to an act of Congress) and the court in the Atkin case (as to an act of the State Legislature) held that statutes could limit the hours each day that a laborer could work on a public construction contract.
None of such cases is remotely concerned with the right or power of the head of an administrative agency to make police power decisions. Nor are such cases concerned with the limits of jurisdiction prescribed by local statutes or with questions of open competitive bidding. Each of such cases may be relied tin only as establishing that the statutory enactments did not violate constitutional limitations.
McMillen v Browne (14 NY2d 326) is a case where the City of New York provided by statutory enactment in the Administrative Code that minimum wages must be paid on contracts with the city. That case is no different than the others in that local legislative body, within its powers of "Home Rule,” enunciated a policy. Furthermore, such rule is applicable for all contractors and does not discriminate in favor of some as against others.
People v Crane (214 NY 154) is distinguishable for the same reason as McMillen v Browne in that a statute was involved. The statute sustained was a state statute which required citizens to be employed on public works contracts. The holding of the court is that no constitutional right of aliens is infringed upon and that the State may "discriminate between citizens and aliens in the distribution of its own resources.”
Accordingly, plaintiffs must succeed in their attempt to have certain administrative actions taken by both the Administration of Transportation and Commissioner of Purchase of *727 the City of New York declared illegal and enjoining the continuance of such action.