Stevens, J.
In a complaint filed in 1970 by respondent-appellant, State Division of Human Eights (the Division), petitioner-respondent, Kilian Manufacturing Corporation (Kilian), was charged with an unlawful discriminatory practice relating to employment. Following a hearing, the Division found that Kilian’s hiring practices were discriminatory in violation of section 296 of the Human Eights Law (Executive Law, art. 15). The State Human Eights Appeal Board affirmed. Kilian commenced this proceeding in the Appellate Division which reversed the Appeal Board and the Division appealed.
The facts are not in dispute. In a period approximating 50 years since its establishment Kilian had never employed a Black *206 or Spanish-surnamed person. It recruited its work force, which experienced a rather rapid turnover, 85% by referrals from its employees and 15% by “ walk-ins ”, i.e., persons walking in from the street and filing job applications. The work was largely unskilled with no special educational requirement and such training as was necessary was usually on the job training.
Statistics indicated that, as of the time of the hearing, there was a 10.7 % Black population in the area where the majority of Kilian’s employees resided. Note was taken of the fact that between the filing of the complaint and the holding of the hearing on April 25, 1972, two Blacks and one Spanish-surnamed person were employed by Kilian in a total work force of 297.
The Division on its own motion initiated the investigation and the complaint as it had the power to do (Human Rights Law, § 295, subd. 6, par. [b]). At the public hearing the Division not only introduced evidence as to the fact pattern of hiring, but presented statistical evidence as to the potential reservoir of Blacks resident in the area which was the largest source of Kilian’s employment.
Following the public hearing, the hearing commissioner made certain findings of fact as to Kilian’s source of recruitment, the nature of Kilian’s operations, etc., as heretofore set forth, and found also that Kilian had never advertised for employees, nor had it ever utilized any employment organization to recruit employees. He found that Kilian’s policy of recruitment had the effect of perpetuating an all-white work force which barred or excluded Black and Spanish-surnamed persons from equal opportunity to obtain employment with Kilian. The findings were affirmed and adopted by the Division. Kilian was ordered, inter alia, to cease an(l desist from barring or refusing to hire any persons because of race, color or national origin, and to take certain affirmative action to broaden its source of recruitment. The purpose was to change a pattern of recruitment which had an effect similar to that which would have been achieved if unlawful discrimination had been intended.
The question at issue is whether there is substantial evidence to sustain a finding of discriminatory action by Kilian. Or, to phrase it somewhat differently, is statistical evidence in conjunction with a hiring system which has the effect, even without evidence of intention, to exclude Black and Spanish *207 surnamed persons sufficient to establish discriminatory action within the meaning of the statute 1
Admittedly, at the time the pattern of employment was established there were no laws which affirmatively imposed an obligation of equal employment or even the dissemination of information regarding equal employment opportunities. Thus, Kalian was not violating any law prior to the enactment of article 12, found in chapter 118 of the Laws of 1945, the predecessor of present article 15 of the Executive Law. With the advent of World War II, the need for fullest utilization of available manpower assumed the highest priority, especially in defense industries. Citadels of exclusivity based on discrimination because of race, creed, color or national origin began to crumble under the force of new ideas and the impact of an emerging philosophy of equal opportunity for all. New York assumed the lead in this field with the result that article 12, above referred to, was enacted in 1945 and added a new dimension in the area of human rights.
Section 296 of the Human Rights Law (Executive Law, art. 15) in defining unlawful discriminatory practices, insofar as here pertinent, provides: “ 1. It shall be an unlawful discriminatory practice: (a) For an employer, because of the age, race, creed, color, national origin or sex of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment. ’ ’
Article 15 of the Executive Law is deemed “ an exercise of the police power of the state for the protection of the public welfare, health and peace of the people of this state, and in fulfillment of the provisions of the constitution of this state concerning civil rights.[1] ” (Human Rights Law, § 290, subd. 2.) The Legislature recognized that it is a State responsibility to assure, inter alia, that every individual be afforded an equal opportunity to enjoy a full and productive life (Human Rights Law, subd. 3). The equal opportunity for employment is basic to the equal opportunity to enjoy a full and productive life unless the individual fall into that somewhat rare category where he or she is possessed of independent means.
*208 It should be pointed out that the figure of 10.7% Blacks in the area of Kilian’s recruitment source is not a figure which has been constant throughout Kilian’s existence. At the time that Kilian was established, 50 years ago, the figure was approximately 2%, the percentage increasing over the years until at the time of the complaint it amounted to 10.7%. Since Kilian’s labor force has not remained constant, being subject to fluctuatipn in numbers as well as turnover, the charge essentially is that Kilian’s hiring practices presently result in an underutilization of Blacks and fail to make available to Blacks employment opportunities that exist or are available. Thus, the system is inherently self-perpetuating so as to maintain or tend to maintain an all-white work force.
Prior to the filing of the complaint, an investigation was made and a report filed analyzing Kilian’s employment practices. The report is summarized in the complaint and there is no doubt that Kilian understood the charge and the import of the material upon which the charge was founded.
A system of employment which at a given time, as in the early years of Kilian’s existence, is not discriminatory may, in effect, become so over a period of time because of changed circumstances. Nor does a finding of a discriminatory practice necessarily import a willful and actual intent to evade the law. A permitted practice can result in a undesirable condition which conflicts with the objectives of the Human Bights Law. In the absence of conduct from which willful intent might be presumed, the question rather is whether an employer knows or should have known the ultimate result or effect of its hiring practice. It is both unrealistic and impractical to assume in today’s world that the persistence of an all-white labor force, the nature of whose work and duties are unskilled, in an area where the job or employment potential is 10.7% Black, does not .result in a denial of equal job opportunities. (See United States v. Ironworkers Local 86, 315 F. Supp. 1202, affd. 443 F. 2d 544, cert. den. 404 U. S. 984.) The crucial test is whether there is established in practice a pattern of employment policy which encourages or permits conduct which -runs counter to the expressed purpose of the statute. The order entertained here does not direct the hiring of a Black or Spanish-surnamed person nor does it establish a quota of employment for them. It cannot be too greatly *209 emphasized that the order only required that information concerning job opportunities be disseminated by means reasonably calculated to reach the Black job market so that persons so inclined may file the necessary application. Twenty-six years without the interviewing of more than a single Black job applicant (if that), given the location of Kilian’s business and the existence of its employee recruitment policy, permits a reasonable inference even by the uninitiate that its policy runs counter to the provisions and objectives of the Human Rights Law. The expertise possessed by the Division and the mandate imposed upon it by law warranted investigative action and the procedure which followed. The existence of a subjective intent to discriminate is not a condition precedent to the exercise by the Division of its powers. Where a condition exists in fact which permits an objective' test as to whether a practice operates invidiously against a particular group, if it be so found, such obstacle can and should be removed by appropriate action unless the practice can be justified by business necessity. (Griggs v. Duke Power Co., 401 U. S. 424.) As noted in the cited case, a practice may be fair in form but discriminatory in operation. Such is the case before us. The Human Rights Law, inter alia, aims at equality of job opportunity not discriminatory preference. That is precisely what the Division is here seeking to achieve.
The existence of Kilian’s acknowledged hiring policies, the consequences flowing therefrom, together with the statistical evidence offered constitutes substantial evidence to sustain the findings made. With respect to minority employment or the lack of it, statistics as to Kilian’s employment policy and practice may be helpful to a determination of the questions here involved. (See McDonnell Douglas Corp. v. Green, 411 U. S. 792, 805.) The affirmative action directed is neither unduly burdensome nor unreasonable. Discrimination today is rarely so obvious, or its practices so overt that recognition of the fact is instant and conclusive. “ One intent on violating the Law Against Discrimination cannot be expected to declare or announce his purpose. Far more likely is it that he will pursue his discriminatory practices in ways that are devious, by methods subtle and elusive — for we deal with an area in which ‘ subtleties of conduct * * * play no small part ’. (Cf. Labor Bd. v. *210 Express Pub. Co., 312 U. S. 426, 437.) ” (Matter of Holland v. Edwards, 307 N. Y. 38, 45.) Statistics are valuable and often demonstrate more than the testimony of witnesses, “ and they should be given proper effect by the courts.” (Jones v. Lee Way Motor Frgt. 431 F. 2d 245, 247, cert. den. 401 U. S. 954.)
It may be questioned whether a policy of recruitment of 85% employee referral and 15% “ walk-ins ” permits of discriminatory action in contravention of the provisions of the statute. It cannot be doubted that the 85% employee referrals could foster a pattern inconsistent with the provisions of law because the natural instinct of human beings is to recommend those with whom they are familiar or whose traits and characteristics have a measure of identity with their own. The 15% constituting walk-ins does not by its very nature establish the absence of discriminatory action, real or potential. Neighborhoods are frequently so well defined that the ethnic identity of the residents may be determined with a reasonable degree of accuracy, and although written applications, as was required here, do not necessarily establish or negate the presence of a policy which might have the effect of discrimination, it is not so conclusive as to necessarily exclude the Division from making inquiry in the exercise of its statutory power. It is the total picture which is considered and not a single facet.
It cannot be said that the Division was not warranted in concluding that there was here, too, constructive discrimination, notwithstanding the absence of any proof of subjective motive on the part of the employer to produce such a result. The record discloses that a prospective employee who walks in from the street is seen by the company’s receptionist and is given an application to fill out. This application is then placed in an “ active file ”, to be kept alive for three months. Although there is no proof in the record .that any such notation has ever been made on the application form, it is apparent that opportunity is available in this personal interview to take note of the applicant’s ethnic status.[2] When an employment opening occurs, the personnel director goes through the active file and picks someone who he thinks “ is eligible for the job ”. A further *211 personal interview then precedes actual employment. There is utilized no standard method of selection, 'such as consideration of applications, in order of date of receipt, nor are the pending applications in any way rated, grouped o,r aged. Here, too, the absolute freedom in practice to give unbridled license for subjective unconscious discriminatory selection, opens the door to self-perpetuation of a labor force with the characteristics judged by the personnel director to be desirable — a judgment made without the constraint, so far as this record discloses, of any policy directive or guideline laid down by management.
Some of the court feel that the use of the term “ cease and desist ” in the order necessarily imports a finding of previous conscious and willful discriminatory action, and that the assertion of a lack of applications by Blacks tends to negative any such conclusion. In my view, a determination of willful and deliberate action is not prerequisite to the issuance of a cease and desist order, if the actual condition contravenes the law and stated policy. Moreover, a lack of job applications could stem as well from a belief of futility as from conscious lack of interest. (Lea v. Cone Mills Corp., 301 F. Supp. 97, 102), affd. in pertinent part 438 F. 2d 86.
The Legislature in article 15, in its exercise of the police power, has declared the public policy of this State .to be what it deemed necessary for the public good. “ The Legislature may from time to time broaden regulation in the interest of the public welfare to the extent deemed necessary or beneficial by reason of changing living and economic conditions. [Citations omitted.] A proceeding step by step by legislative bodies to eliminate the practice of racial discrimination in affairs closely connected with the lives of our citizens is not only a reasonable, but in view of changing times and circumstances, a required method of procedure in the interest of public welfare.” (Matter of New York State Comm. Against Discrimination v. Pelham Hall Apts., 10 Misc 2d 334, 343 [Eager, J.].) There was a sound basis for the vesting in the Division of the power granted by article 15. Its exercise of such power, if not clearly arbitrary, discriminatory and without reasonable basis, should be sustained. The means here used by the Division are reasonably calculated to achieve the desired objective without unduly infringing upon the .rights of Kilian.
*212 It does not follow from today’s decision that it will be open to the Division, in any community in which there is a significant minority population, on a statistical predicate only, to question an employer on whose payroll there is to be found no minority representative. In addition there must be proof of recruitment or employment practices in the individual case which in actual operation warrant the conclusion, based on direct evidence or rational inference, or both, that there is a constructive, if unintended, discriminatory practice.
The order appealed from should be reversed, without costs, and the matter remitted to the Appellate Division with directions to grant the Division’s cross motion for enforcement, and in so doing with power to modify the first directory paragraph of the Division order to read as follows: “ Ordered that the Respondent Kilian Manufacturing Corporation, its agents, representatives, employees, servants, successors and assigns, shall cease and desist from engaging in practices resulting in the barring or refusing to hire or employ any person or persons because of the race, color or national origin of any such person or persons, and from establishing or maintaining any policies or practices with respect to recruitment or hiring, the effect of which will be to restrict equal opportunity because of the race, color or national origin of any person or persons ’ ’.
Chief Judge Breitel and Judges G-abrielli, Jones, Wachtler, Rabin and Wither* concur.
Order reversed, without costs, and the matter remitted to the Appellate Division for further proceedings in accordance with the opinion herein. Upon the appeal herein there were presented and necessarily passed upon the following questions under the Constitution of the United States, viz: The petitioner-respondent argued that the Human Rights Law, as applied in this case, is invalid on the ground of its being repugnant to the due process of law provisions of . the Fourteenth Amendment to the Constitution of the United States, and, further, that the lack of any notice to the petitioner-respondent in the complaint herein or otherwise as to the nature of any alleged violation of the Human Rights Law, thus requiring the petitioner-respondent *213 to stand trial at the public hearing herein without notice of what violation of the said law it was charged with, deprived the petitioner-respondent of due process of law as guaranteed by the Fourteenth Amendment to the Constitution of the United States. The Court of Appeals considered the aforesaid arguments, and held there were no constitutional violations.

. See N. Y. Const., art. I, § 11.

. The personnel director was able to recall that prior to March, 1970, only one Black had applied during his 26 years.

 Designated pursuant to section 2 of article VI of the State Constitution