Chief Judge Breitel.
The issue is whether the New York City Deputy Mayor-City Administrator has the power to mandate by regulation affirmative action, in the form of meeting prescribed minority percentages of employment, by construe *644 tion contractors with the city. The question arises on appeal from determinations adverse to defendant city in an article 78 proceeding converted into an action for a declaratory judgment. The city appeals.
The order of the Appellate Division should be affirmed. The Deputy Mayor’s regulations mandating affirmative action were in excess of existing authorizing legislation. To be sure, there is a strong public policy, expressed in both State and local law, against minority discrimination. While the Mayor or the Deputy Mayor may be empowered to require compliance with these laws by construction contractors, no State or local law authorized the city executive to mandate an affirmative action program containing minority hiring percentages. Hence, the regulations, if they otherwise complied with constitutional limitations, were invalid as in excess of the power of the city executive.
On April 2, 1968, the then Mayor issued Executive Order No. 71, which prohibited construction contractors doing business with the city from discriminating in their hiring practices because of race, creed, color, or national origin. The order further provided that the awarding of city contracts would be conditioned upon a bidder submitting an affirmative action program to insure that employees and applicants would be treated without regard to their race, creed, color, or national origin. The term "affirmative action” was not defined in the order. The Deputy Mayor was given the power to issue rules and regulations to implement the order.
Thereafter, representatives of the city, the State, the contractors, and the labor unions entered into discussions to formulate a uniform plan to meet the affirmative action requirements of the Mayor’s executive order and a similar Governor’s executive order. Agreement was eventually reached on a plan, known as the "New York Plan”, for on-the-job training of minority group members and their referral for training to appropriate unions. Its purpose and effect, if successful, were to increase the pool of persons eligible for employment by including theretofore excluded members of certain minorities. The plan became effective on December 10, 1970.
Dissatisfied with the effectiveness of the plan, on January 18, 1973, the Mayor withdrew the city from participation. On July 5, 1973, the Deputy Mayor officially promulgated "Rules, Regulations and Orders of the Deputy Mayor-City Administra *645 tor”, purportedly pursuant to Executive Order No. 71. Briefly, the regulations provide that, as a precondition to an award of a construction contract with the city, a contractor must agree to make "good faith” efforts to provide specified "percentages” of "minority man-hours” of work on each of the contractor’s projects with the city or with others throughout the term of the city contract involved. According to the regulations, this is not to be interpreted as requiring the use of "quotas” in hiring. The regulations further require the contractor to effect "programs by [building trades] unions or organizations to advance trainees to journeyman status when they successfully complete their course of training, and programs to accept new minority apprentices at the rate of no less than one minority apprentice to every three non-minority apprentices.”
The purpose and effect of the new plan was to go beyond increasing the pool of persons eligible for employment in the building trades, and to assure by mandate the employment of members of minorities previously excluded by invidious discrimination. It is this added purpose and effect which raise the questions presented on this appeal.
Petitioners contend that neither the Mayor nor the Deputy Mayor have the power to promulgate the regulations and that the provision regarding apprentices is in conflict with State law on apprentice training.
Section 343-8.0 of the New York City Administrative Code prohibits discrimination in employment by those contracting with the city (Local Law No. 44 of City of N. Y., eff Sept. 9, 1942). In pertinent part, the section provides: "It shall be unlawful for any persons engaged * * * in * * * construction * * * pursuant to a contract with the city * * * to refuse to employ or to refuse to continue in any employment any person on account of the race, color or creed of such person”.
Section 343-8.0 also prohibits an employer from soliciting information about the race, color or creed of an employee or applicant, and requires the wording of relevant parts of the local law to appear on all agreements entered into with the city. Violation of the section is punishable by fine or imprisonment.
Certainly, legislation prohibiting discrimination in employment, such as section 343-8.0 of the Administrative Code, requires executive enforcement (see Gaynor v Rockefeller, 21 AD2d 92, 97, affd 15 NY2d 120). Yet, executive action in enforcing such legislation may not go beyond stated legislative *646 policy and prescribe a remedial device not embraced by the policy (see Matter of Small v Moss, 279 NY 288, 295-296; Matter of Goelet v Moss, 248 App Div 499, 500-501, affd 273 NY 503; Edenwald Contr. Co. v City of New York, 86 Misc 2d 711, affd on opn at Supreme Ct 47 AD2d 610; cf. Fifth Ave. Assn. v Lindsay, 73 Misc 2d 111, 115-116, affd 41 AD2d 1031).
Consequently, within the bounds of the legislative policy to be executed, the executive is accorded flexibility in determining the proper methods of enforcement. Although not often given explicit recognition, the degree of flexibility varies according to the nature of the problem sought to be remedied by the legislation (see, e.g., Matter of Sullivan County Harness Racing Assn. v Glasser, 30 NY2d 269, 276-277). Where it is impracticable for the legislative body to fix specific standards for enforcement without destroying the flexibility necessary to meet the variety of circumstances likely to be encountered in carrying out the legislative will, broad flexibility in determining the proper methods of enforcement will be sustained. The subtle nature of noxious discriminatory practices makes this area appropriate for a broad declaration of policy, leaving to the executive discretion to determine the particular otherwise valid means necessary to enforce antidiscriminatory prohibitions (see Ross v Arbury, 206 Misc 74, 78, affd 285 App Div 886).
But no matter how appropriate the area of racial discrimination is for flexible standards of enforcement, the regulations issued by the executive to implement antidiscriminatory legislation may not create a different policy, not embraced in the legislation, toward minority discrimination (see Ross v Ar-bury, supra). Such executive action would constitute an impermissible exercise of legislative power vested by the New York City Charter in the city council (New York City Charter, ch 2, §21; see Matter of Natilson v Hodson, 264 App Div 384, 386-387, affd on other grounds 289 NY 842).
In this instance, the Administrative Code makes it unlawful for those contracting with the city to refuse employment because of race (§ 343-8.0, subd a). The code further prohibits a contractor from seeking information potentially useful to a would-be discriminator, such as the ethnic classification of job applicants (subd b). The only expressed affirmative requirement in the city law is that all city contracts contain the provisions of subdivisions a and b of the local law. Nowhere in *647 the law has the city council prescribed affirmative action to redress the effects of discrimination.
There is a dramatic distinction between the expressed legislative policy of prohibiting employment discrimination and the mayoral policy of mandating employment "percentages”, however disavowed unpersuasively as being quotas. Prohibition of discrimination, properly utilized, allows individual employment opportunity without invidious impediments (see State Div. of Human Rights v Kilian Mfg. Corp., 35 NY2d 201, 208-209). But mandating percentages displaces the standard of individual merit with a standard that work forces reflect the ethnic composition within the relevant geographic area even if distribution based on merit would produce a different composition (see Equal Employment Opportunity Comm. v Local 638, 532 F2d 821; Bridgeport Guardians v Members of Bridgeport Civ. Serv. Comm., 482 F2d 1333, 1340-1341; Developments in the Law: Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv L Rev 1109,1301).
The executive regulations would establish an affirmative action policy of benign discrimination for certain minorities. This is not to say that all executive affirmative action is impermissible. On the contrary, a policy limited to increasing the pool of eligibles for employment, by including previously excluded minority workers, might be allowable even under the limited city legislation (see Alevy v Downstate Med. Center, 39 NY2d 326, 334-335, 337; State Div. of Human Rights v Kilian Mfg. Corp., 35 NY2d 201, 208-209, supra; Weiner v Cuyahoga Community Coll. Dist., 19 Ohio St 2d 35, 39-40, cert den 396 US 1004). But in this instance, the executive action goes far beyond merely implementing existing State and local law to effectuate equal employment opportunity and in effect mandates percentage employment. Because the regulations exceed present State or local legislation, if not constitutional limitations, they are beyond the executive power and are thus invalid (see Matter of Picone v Commissioner of Licenses of City of N. Y., 241 NY 157, 162).
And this conclusion is not necessarily inconsistent with that reached by some Federal courts. These courts have upheld executive mandates of minority employment percentages as rationally related to cost considerations in government and government-assisted projects (see, e.g., Contractors Assn. of *648 Eastern Pa. v Secretary of Labor, 442 F2d 159, 170-171, cert den 404 US 854; Farkas v Texas Instrument, 375 F2d 629, 632, n 1; see, also, Southern 111. Bldrs. Assn. v Ogilvie, 471 F2d 680, 685). Essentially, these courts found that racially restrictive employment practices limited available manpower for government and government-assisted projects, thereby indirectly affecting the cost of these projects. Since cost minimization is a proper consideration in setting government procurement policy, the executive orders were found to be lawful exercises of executive power. Moreover, in the case of the President’s executive orders, the courts found that the relatively recent congressional antiemployment discrimination statutes were not intended to limit the President’s long-standing practice of using executive power to help remedy past discrimination by government contractors (Contractors Assn. of Eastern Pa. v Secretary of Labor, 442 F2d 159, 168-171, supra).
The mayoral executive regulations are distinguishable. The regulations mandate minority employment percentages on all construction projects, public or private, of those doing business with the city, whether or not these projects are city projects or assisted by city funds. The city regulations are not related to cost considerations but instead attempt to use the city’s contracting power to promote an extrinsic social policy, for which there is no grant of legislative power. For example, the percentage of minority man-hours on a contractor’s private project would have to meet New York City requirements without those employment practices having any direct effect on the cost of the city-sponsored project.
The regulations are invalid for an additional reason. Subdivision c of section 3 of the regulations, governing apprenticeship programs, is inconsistent with State law providing the standards for such programs (Labor Law, § 815, subd 5; Executive Law, § 296, subd 1-a, par [a]). Essentially, the State statutes provide that apprentices shall be selected on the basis of objective qualifications alone, without reference to minority status (id.). Subdivision c of section 3 of the regulations does not follow this pattern of objective standards, and hence is invalid because it does not conform to the statute law (People v Cook, 34 NY2d 100, 105; McMillen v Browne, 14 NY2d 326, 331). Moreover, since the section of the regulations dealing with apprenticeship is integral to the percentage formulas prescribed by minimum minority man-hour requirements, the regulations are invalid.
*649 In the foregoing discussion there has been no reference to a line of Federal cases which sustain mandated employment ratios as a corrective to past discrimination exclusively in the context of a judicial remedy under title VII of the Civil Rights Act of 1964 (e.g., Rios v Enterprise Assn. Steamfitters Local 638, 501 F2d 622, 629, and cases cited; see, generally, Hastie, Affirmative Action in Vindicating Civil Rights, 1975 U of Ill L Forum 502, 508). Whatever their basis or soundness, they do not involve any principles relevant to this case.
In conclusion, the mayoral regulations are invalid for lack of legislative authorization, for inconsistency with applicable State statutes, and because they impose a quota of arguable constitutionality, in excess of existing statutory programs, local and State, for the correction of past invidious discrimination. Insofar as programs do not mandate percentage employment formulas, but only would enlarge the pool of persons eligible for employment based on discrimination-free merit selection, they are permissible under existing law (State Div. of Human Rights v Kilian Mfg. Corp., 35 NY2d 201, 208-209, supra; cf. Alevy v Downstate Med. Center, 39 NY2d 326, 334-335, supra).
Obviously, no last word may be pronounced on the solution of problems of past and current discrimination. None is, and this case of course provides no warrant for such an advisory pronouncement. Hence, it would be unwise to read into this case, anymore than into the Kilian or Alevy cases (supra), a view which the court does not have and has not pronounced that proportional quotas in selection for employment or admission to schools of higher education are permissible within constitutional limitations.
Accordingly, the order of the Appellate Division should be affirmed, without costs.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order affirmed.