STATE DIVISION OF HUMAN RIGHTS, Respondent, v BINGHAM-
TON PRESS COMPANY, INC., Petitioner.

Fourth Department, April 6, 1979

232

## APPEARANCES OF COUNSEL

*Nixon, Hargrave, Devans & Doyle (Eugene Ulterino* of counsel), for petitioner.

*Ann T. Anderson (Adele Graham* of counsel), for respondent.

## OPINION OF THE COURT

DILLON, P. J.

Petitioner (Binghamton Press) publishes four newspapers in Binghamton, New York, one of which is *The Sunday Press.* In an edition of *The Sunday Press* circulated on January 16, 1972 there appeared a "help wanted" advertisement which included the statement: "Salesmen: If you are an $18—25,000 caliber man, we'd like to meet you personally." The advertisement was presented to Binghamton Press by Tempo Advertising, Inc., on behalf of National Chemsearch Corporation and was printed and published as composed by Tempo.

These long-delayed proceedings were first instituted on February 14, 1972 when the president of Women's Equity Action League filed with the Syracuse office of the State Division of Human Rights a complaint charging Binghamton Press and National Chemsearch Corporation with unlawful discriminatory practices relating to employment on the basis of sex. An order after conciliation was issued on May 5, 1972 upon a conciliation agreement entered into by the complainant, the division and National Chemsearch Corporation. Almost three years later, on January 8, 1975, the complaint against Binghamton Press was dismissed by order of the commissioner of the division. Upon appeal to the State Human Rights Appeal Board, the order dismissing the complaint was reversed on June 30, 1975 and the complaint was reinstated. The public hearing was not held until November 23, 1976 and the decision and order of the division is dated November 16, 1977. The hearing officer found that Binghamton Press, "in violation of the Human Rights Law, aided and abetted an unlawful discriminatory act, by the publication of an employment advertisement for a position within the purview of the Human Rights Law which limited employment opportunities on the basis of sex."

The order, which was affirmed by the State Human Rights Appeal Board on September 1, 1978, provides as follows: "ORDERED, that Respondent, its agents, representatives, employees, servants, successors and assigns, shall cease and

desist from publishing any employment advertisement in any of its newspapers which specifies a preference for applicants on the basis of sex without first securing from the prospective employer or agent thereof a written certification that the job is not covered by the Human Rights Law or is instinct with a bona fide occupational qualification."[1]

That the language of the publication complained of is discriminatory is not disputed. It expresses a preference for men to the exclusion of women for employment positions not uniquely required to be filled by men and is offensive to the Human Rights Law.

Sex discrimination in employment is prohibited by section 296 of the Executive Law. It is an unlawful discriminatory practice for any employer or employment agency to circulate an advertisement which expresses an employment preference based upon sex unless that preference represents a bona fide occupational qualification (Executive Law, § 296, subd 1, par [d]). It is equally discriminatory to aid and abet such an unlawful discriminatory practice (Executive Law, § 296, subd 6).

■ It is well settled that a newspaper is not an "employer" or "employment agency" as those terms are used in section 296 (subd 1, par [d]) of the Executive Law (Executive Law, § 292; cf. *Brush v San Francisco Newspaper Print. Co.,* 315 F Supp 577, 580) and thus Binghamton Press may not be held

---

1. The order also directed that Binghamton Press take the following affirmative action:

"1. Respondent shall forthwith train its classified advertising personnel to enable them to screen advertisements for any unlawful limitation, specification or discrimination.

"2. Respondent shall forthwith, in writing, instruct its supervisory employees, agents and officers engaged in or assigned to the solicitation, composition or acceptance of employment advertisements, that Respondent maintains a policy of not publishing any such advertisement that contains any limitation, specification or discrimination as to sex unless based upon a bona fide occupational qualification; and in the event of the submission of any employment advertisement which contains any such limitation, specification or discrimination, then prior to the publication of any such advertisement, a written certification must be submitted by the advertiser stating that the job is not covered by the Human Rights Law or the job specification represents a bona fide occupational qualification. Respondent shall forward a copy of such instructions to the State Division of Human Rights, Attention Compliance Investigation Unit, 2 World Trade Center, New York, New York 10047.

"3. Respondent shall make available to the duly authorized representatives of the Division such documents and information as may be necessary for the Division to ascertain whether there is compliance with this order."

culpable under that section.[2] Where a newspaper has published employment want ads under separate sex designations, however, it has been held to have engaged in an unlawful discriminatory practice on the basis that it aided and abetted sex discrimination *(National Organization for Women v State Div. of Human Rights,* 34 NY2d 416, 421). While condemning the practice of listing employment advertising under columns captioned "Help Wanted—Male" and "Help Wanted—Female", the Court of Appeals in *National Organization for Women* pointedly did not decide (p 421) the issue of "whether a newspaper has the obligation of determining whether a sex designation set forth internally within an advertisement represents a bona fide occupational qualification within the meaning of section 296 (subd. 1, par. [d]) of the Executive Law". Remaining undefined, therefore, is the extent of the duty, if any, to be imposed upon a newspaper to screen the body content of an employment advertisement which contains a sex designation.

Our first inquiry as this case is presented[3] is whether a newspaper aids and abets sex discrimination when the body content of a published advertisement is palpably discriminatory and the published job title clearly lacks any basis as a bona fide occupational qualification. We hold that it does and that the publication of such an advertisement constitutes an unlawful discriminatory practice within the meaning of subdivision 6 of section 296 of the Executive Law.

Binghamton Press argues that because the Legislature intended to and did exclude newspapers from primary culpabil-

---

2. Repeated efforts to amend section 296 (subd 1, par [d]) to include newspapers within its ambit were rejected by the Legislature in 1973, 1974, 1975 and 1976.

3. Section 298 of the Executive Law requires that a proceeding of this nature "shall be brought in the appellate division of the supreme court of the state in the judicial department embracing the county wherein the unlawful discriminatory practice which is the subject of the order occurs or wherein any person required in the order to cease and desist from an unlawful discriminatory practice or to take other affirmative action resides or transacts business." Since the printing and publication of the discriminatory advertisement occurred in Broome County where the Binghamton Press transacts business, the proceeding should have been brought in the Third Department. The statutory designation of forum, however, is predicated on geographical considerations and hence relates to venue rather than jurisdiction. Since the proceeding must be "heard and determined by the court * * * as expeditiously as possible" (Executive Law, § 298), removal of the case to the Third Department would be unwarranted, particularly under circumstances where more than seven years have passed since the filing of the initial complaint. In retaining jurisdiction, however, we nonetheless express our disapproval of the choice of venue—a choice apparently made with the approval of both parties.

ity under the provisions of section 296 (subd 1, par [d]) of the Executive Law, it is illogical to conclude that it may be held liable as an aider and abettor of the acts forbidden thereunder. That argument has been largely answered by the Court of Appeals in *National Organization for Women v State Div. of Human Rights* (34 NY2d 416, *supra*) and *Matter of New York Times Co. v City of New York Comm. on Human Rights* (41 NY2d 345). In the latter case, which concededly dealt with the publication of advertisements which themselves contained no expression of discrimination, the court stated that the *New York Times* "may be held as an aider and abettor of discrimination only if it published advertisements that expressed discrimination" (41 NY2d 345, 351, *supra*).

Binghamton Press would have us distinguish *National Organization for Women v State Div. of Human Rights (supra)* on the basis that there the newspaper's culpability as an aider and abettor arose from its affirmative action in publishing want ads under separate sex designations, while here it merely published without change an advertisement as submitted by an advertiser and thus may not be said to have aided and abetted the principal conduct. The distinction sought to be drawn, however, is without validity.

In *National Organization for Women v State Div. of Human Rights (supra),* the sex designated column headings were preceded by a disclaimer to the effect that under State and Federal law sex discrimination in employment is prohibited and that the separate column listings were employed for reader convenience only.[4] For obvious reasons, the printing of such a disclaimer is no longer required by the Human Rights Division but it seems clear beyond argument that absent the printing of any notice that sex discrimination is prohibited by law, the body content of employment advertising can do as much, if not more, to perpetuate sex discrimination as the already condemned practice of using separate "Male"—"Female" columns accompanied by such notice.

The State's strong public policy against discrimination implicitly recognizes that "unlawful discrimination against

---

4. The disclaimer stated: "The New York State Law on Human Rights and the Federal Civil Rights Act of 1964 prohibit discrimination in employment because of age or sex unless based on a bona fide occupational qualification. Help Wanted and Situations Wanted advertisements are arranged in columns captioned 'Male' and 'Female' for the convenience of readers and are not intended as an unlawful limitation or discrimination based on sex."

women is widespread and cannot be tolerated" *(National Organization for Women v State Div. of Human Rights, supra,* p 420). Where a newspaper permits its advertising space to be used for the placement of obviously discriminatory advertising for an employment position clearly not related to a bona fide occupational qualification, it must be held culpable for perpetuating sex discrimination.

We do not believe that such a construction of subdivision 6 of section 296 of the Executive Law encroaches upon State or Federal free press guarantees. The advertisement at issue here required no more of Binghamton Press than a visual examination of the submitted material to determine its patently discriminatory content. Thus viewed, the published material is not unlike that found in *Pittsburgh Press Co. v Human Relations Comm.* (413 US 376) and *United States v Hunter* (459 F2d 205, cert den 409 US 934)[5] and may be characterized as commercial advertising not entitled to First Amendment protection. "Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *(Pittsburgh Press Co. v Human Relations Comm., supra,* p 389.)

Significantly, *Pittsburgh Press* has been cited without criticism as demonstrating the kind of commercial advertisement not entitled to First Amendment protection; i.e., that the transaction proposed in the underlying advertisement is itself illegal (see *Carey v Population Servs. Int.,* 431 US 678, 700-701; *Linmark Assoc. v Willingboro,* 431 US 85, 98; *Virginia Pharmacy Bd. v Virginia Consumer Council,* 425 US 748, 772; *Bigelow v Virginia,* 421 US 809, 821, 826). Here, as in *Pittsburgh Press,* the transaction proposed in the advertisement— sex discrimination in employment, is illegal.

Similarly, in *Hunter (United States v Hunter,* 459 F2d 205, cert den 409 US 934, *supra),* the newspaper published classified advertisements for the rental of a furnished apartment in

---

5. It is true, as Binghamton Press points out, that insofar as there was reliance in both *Hunter* and *Pittsburgh Press* upon the decision in *Valentine v Chrestensen* (316 US 52), subsequent cases emasculating the rule of *Valentine* demonstrate that such reliance was misplaced; it is equally true that neither *Hunter* nor *Pittsburgh Press* has been overruled.

what was denominated a "white home". The court held that the plain meaning of the statute[6] included newspapers; that the statute was not a "printer's ink" statute[7] since all the publisher had to do was read the advertisement to find the discrimination; and that as applied to newspapers, the statute was constitutional because the advertisement was commercial in nature.

■ Having thus concluded that Binghamton Press engaged in an unlawful discriminatory practice in publishing the advertisement of January 16, 1972, we turn to a review of that portion of the order which directs Binghamton Press to "cease and desist from publishing any employment advertisement in any of its newspapers which specifies a preference for applicants on the basis of sex without first securing from the prospective employer or agent thereof a written certification that the job is not covered by the Human Rights Law or is instinct with a bona fide occupational qualification".

The Human Rights Law authorizes the Commissioner of Human Rights to direct that the offending party cease and desist from an unlawful discriminatory practice and further authorizes him to direct that affirmative action be taken as will "effectuate the purposes" of the law (Executive Law, § 297, subd 4, par c). "[T]he Legislature [has vested] broad authority in the commissioner so that he may take 'appropriate action to eliminate and prevent discriminatory practices.' (See, e.g., *Batavia Lodge No. 196, Loyal Order of Moose v New York State Div. of Human Rights,* 35 NY2d 143, 146; *Gaynor v Rockefeller,* 15 NY2d 120, 132.)" *(New York Inst. of Technology v State Div. of Human Rights,* 40 NY2d 316, 324.) While the commissioner's discretionary power in fashioning a remedy is expansive, it is not absolute, and where the action ordered to be taken is "erroneous as a matter of law" (p 325) or impermissibly impairs constitutional rights, it will be set aside.

It is not an undue burden upon a newspaper to require that

---

**6.** Subdivision (c) of section 3604 of title 42 of the United States Code provided that "[It shall be unlawful] to make, print, or publish, or cause to be made, printed, or published, any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination."

**7.** A "printer's ink" statute is one which would ordinarily exclude newspapers for the reason that a newspaper should not be burdened with investigation of ad content, as in the cases of statutes dealing with misleading or untruthful advertising.

it refrain from publishing an employment advertisement which is patently violative of section 296 (subd 1, par [d]) of the Executive Law. In reaching that conclusion, however, we recognize that it would be unreasonable to impose upon a newspaper the burden of making an independent investigation to determine whether a particular job is instinct with a bona fide occupational qualification. Indeed, the clear intendment of this court's decision in *National Organization for Women v State Div. of Human Rights* (40 AD2d 107) was to that effect and we find nothing in the Court of Appeals reversal of that case (34 NY2d 416, *supra)* which compels a contrary view. We add only that to require a newspaper, at its peril, to make such an independent inquiry would present grave questions of prior restraint (see *Near v Minnesota,* 283 US 697).

The purpose and effect of requiring a newspaper to procure the written certification in advance of publication is to eliminate the need for the independent investigation and to insulate the newspaper from the imposition of penalties under the Human Rights Law. In those rare cases where a proffered advertisement poses the issue of whether a "job * * * is instinct with a bona fide occupational qualification", the newspaper need only have in its possession the required certification. We do not perceive that this modest condition will impede the publication of lawful advertisements. Nor has it been demonstrated that the implementation of the order will require Binghamton Press to incur expenses of any consequence. Indeed, Binghamton Press may rely in good faith on the representation of an advertiser that a particular job is uniquely and necessarily suited to the sex designation set forth within a proffered advertisement (see *Pittsburgh Press Co. v Human Relations Comm.,* 413 US 376, 390-391, n 14, *supra).*

The determination should be confirmed.

CARDAMONE, SIMONS, DOERR and MOULE, JJ., concur.

Determination unanimously confirmed, without costs.