GEORGE SCHUCK, as President of Local Union No. 3, International Brotherhood of Electrical Workers, AFL-CIO, Petitioner, v STATE DIVISION OF HUMAN RIGHTS et al., Respondents.

CITY OF NEW YORK, Petitioner, v GEORGE SCHUCK, as President of Local Union No. 3, International Brotherhood of Electrical Workers, AFL-CIO, Respondent.

First Department, July 19, 1984

APPEARANCES OF COUNSEL

*Norman Rothfeld* for George Schuck.

*Rosamond Posterman* of counsel (*Roberto Albertorio,* attorney), for State Division of Human Rights, respondent.

*Charles R. Foy* of counsel (*Michael Gage* with him on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for City of New York.

FEIN, J.

In this proceeding, pursuant to section 298 of the Executive Law (Human Rights Law), petitioner, president of Local Union No. 3, International Brotherhood of Electrical Workers, AFL-CIO (Local 3), seeks annulment of the order of the Human Rights Appeal Board, which affirmed (3 to 1) a determination by the Commissioner of the State Division of Human Rights that Local 3 had discriminated against its minority trainees, in violation of the Human Rights Law, through various means which resulted in blocking their attainment of class "A" journeyman status with the union.

Prior to 1970, there were two avenues to full journeyman status in the union. The normal course was initially through the four-year apprenticeship training program, which would qualify an apprentice to take the "MIJ examination", leading to "MIJ journeyman" status. After one additional year of service in this status, concurrent with additional training, the MIJ journeyman would be qualified to take the class "A" journeyman's examination, successful completion of which would earn the "A" journeyman's card.

An alternative route to "A" journeyman status was the so-called "M" program, available to employees of former nonunion electrical shops which were subsequently organized by Local 3. Once the shop owner agreed to a collective bargaining arrangement with the union, those employees would be entered into the "M" program, receiving either an "M" helper's or "M" journeyman's card, based upon the employer's evaluation of each worker's ability. An "M" helper would require up to four years' work and training in order to qualify for the "M" journeyman's examination. After four more years in this status, an "M" journeyman would reach the "A" pay rate (but without the supervisory opportunities available to "A" journeymen), and after three more years at this rate he would be eligible to take the "A" journeyman's examination. Thus, an employee recruited for union membership by this method might spend as much as 7 to 11 years of training before reaching full journeyman status, as opposed to the 5-year program

offered to apprentices starting out through the union's apprenticeship training program. The formerly nonunion recruit would thus not be eligible for the "MIJ" shortcut to "A" journeyman status.

In 1968, the City of New York embarked upon a plan to encourage minority employment by establishing affirmative programs to provide equal employment opportunity for all qualified persons working on city contracts, without regard to race, creed, color or national origin. Local 3 never did fully indorse this "New York Plan for Training", but it did in 1971 enter into a memorandum of understanding with the city for an on-the-job training program to encourage up to 100 minority employees to train for positions in the electrical industry on city-contracted jobs, at a target ratio of one new trainee for every four journeymen, and ultimately to acquire the skills necessary to qualify for full journeyman status. Local 3 was to use its own recruitment resources, primarily, and city funding would be provided for the program, if necessary. The memorandum of understanding further provided, in pertinent part, as follows:

"Trainees will be evaluated and given appropriate credit for previous trade experience.

"Classroom instruction for trainees will be arranged similar to that received by apprentices."

At that time, 15% of Local 3's apprenticeship training program was made up of minorities, with a total of 18% minorities having successfully passed through the apprenticeship training program in the previous three years. Minorities also made up 30% of the nonunion workers organized into membership under the alternate "M" program. This new alternative minority training program was to last for one year, until the end of July, 1972. While Local 3 continued to place minority trainees through the end of that year, the union declined to renew the program. In 1978, the city took over recruitment of these minority trainees and undertook, through formal training in conjunction with the board of education, to provide classroom and on-the-job training as a means for preparing these minority trainees for journeyman status.

Apparently all of the minority trainees so recruited were entered into Local 3's "M" program, and none was switched

onto the "MIJ" track leading to class "A" journeyman status. In fact, throughout the life of this minority program not a single minority trainee had yet, at the time of the administrative proceeding under review, advanced to full "A" journeyman status.

The Commissioner of the State Division of Human Rights concluded that Local 3 had, pursuant to a "hidden agenda", discriminated against its minority trainees by offering them a curriculum different from that taught to regular apprentices in the apprenticeship training program, by failing to allow them to take the "MIJ" examination and its fifth year of classroom training, and generally preventing them from taking the "A" journeyman examination within the same time frame as their contemporaries in the apprenticeship training program "because of the minority trainees' race, color, and/or national origin in violation of the Human Rights Law."

The Commissioner thereupon ordered that Local 3 cease and desist from discriminatory practices in recruitment, selection, training or admission to union membership or obstruction in the progression of minority trainees toward "A" journeyman status. Specifically, the Commissioner directed that minority trainees be provided classroom and related instruction in all respects equivalent to that offered those enrolled in the apprenticeship training program, that the "MIJ" shortcut to "A" status be opened to minority trainees, that full "A" journeyman status be granted without further examination to all individuals having successfully completed the four-year minority training program and two or more calendar years as an "M" journeyman, that all former minority trainees having served as an "M" journeyman for at least one but less than two years be offered an opportunity to take the next "A" examination or at least receive the one additional year of classroom and related instruction provided to trainees in the "MIJ" program, and that unless these directives are complied with within one year, Local 3 should reimburse the city $131,904 for its cost in running the educational aspect of the minority training program to date.

The Human Rights Appeal Board affirmed in a split decision, and Local 3 thereupon brought this proceeding for

judicial review under the Human Rights Law (Executive Law, art 15).

Section 296 (subd 1-a) of the Executive Law provides in part as follows:

"It shall be an unlawful discriminatory practice for * * * [a] labor organization * * * or any joint labor-management committee controlling apprentice training programs:

"(a) To select persons for an apprentice training program registered with the state of New York on any basis other than their qualifications, as determined by objective criteria which permit review;

"(b) To deny to or withhold from any person because of race, creed, color, national origin, sex, or disability, or marital status, the right to be admitted to or participate in * * * an apprenticeship training program, on-the-job training program * * * or other occupational training or retraining program;

"(c) To discriminate against any person in his pursuit of such programs or to discriminate against such a person in the terms, conditions or privileges of such programs because of race, creed, color, national origin, sex, or disability or marital status".

Local 3 points to testimony by a training instructor who had taught about 100 trainees and 300 apprentices from 1966 through 1974, to the effect that different curricula and different paces of training were a necessity for the apprentice trainees and the minority trainees. The educational background and aptitude of the latter group were considered deficient by comparison. Absenteeism and failure were much higher in the minority training group, and consequently he made an effort to provide minority trainees with additional training and after-hours schooling at night and on weekends. According to this instructor, the fifth year "MIJ" curriculum, offered in the apprenticeship program, would have been incomprehensible to those enrolled in the minority training program, because of the disadvantaged background of most of the minority trainees. Some minority trainees were said to be deficient in basic mathematics, an area crucial to this training progression. The instructor asserted that the minority training

program became, of necessity, remedial in nature. At this point, the curricula of the two programs diverged. According to the instructor, to have forced the minority trainees to participate in a fast-track program identical to that of the apprenticeship trainees might well have been unfair to the minority trainees. It is undisputed that there were differences in books and other materials furnished the minority trainees. The instructor conceded that some of the trainees could have passed the "MIJ" test had they been given the same training as the apprentices.

The city urges that the administrative determination was properly based at least upon "necessary reasonable inferences", citing the 1971 memorandum of understanding that required minority trainees to be accorded the same training and job advancement provided to apprentices. The mere breach of this agreement was not *ipso facto* held to constitute violation of the Human Rights Law. The 1971 agreement did not mandate that minority trainees be placed in the apprenticeship training program, or even short circuited through the "MIJ" route in order to avoid the extended "M" program. However, the Commissioner's findings were premised upon the unequal treatment afforded to similarly situated groups (minority trainees and apprentices). This was found to constitute a violation of the Human Rights Law. Non-Hispanic whites made up a majority in both the apprenticeship training program and the "M" division. Those who entered the union progression through an avenue other than the formal apprenticeship training program were found to be victims of "discrimination" in training.

It is notable that of all of the minority trainees recruited, not a single one was found qualified to advance toward full journeyman status along the same track as the apprentice trainees. It appears from this record that minority trainees were automatically shunted into the "M" program, based more on their minority status than on their individual aptitude or qualifications.

A determination by the Commissioner that there has been a violation of the Human Rights Law must be upheld when it is supported by substantial evidence on the whole record (Executive Law, § 297-a, subd 7, par d; § 298; *300*

*Gramatan Ave. Assoc. v State Div. of Human Rights,* 45 NY2d 176). Substantial evidence is that from which " 'an inference of the existence of the fact found may be drawn reasonably' " (*supra,* at p 181; *Matter of Stork Rest. v Boland,* 282 NY 256, 273). The evidence here established more than the requisite reasonable inferences to support the Commissioner's findings that by denying minority trainees the same training and job advancement opportunities as that provided apprentices, Local 3 not only breached its agreement with the city but also violated the Human Rights Law.

A statistical showing of discrimination, while only one of several factors, does constitute substantial evidence of a violation of the Human Rights Law (*State Div. of Human Rights v Kilian Mfg. Corp.,* 35 NY2d 201, app dsmd 420 US 915). "The crucial test is whether there is established in practice a pattern of employment policy which encourages or permits conduct which runs counter to the expressed purpose of the statute" (35 NY2d, at p 208). "Discrimination today is rarely so obvious, or its practices so overt that recognition of the fact is instant and conclusive" (35 NY2d, at p 209). The statistical evidence here is plain. The relative absence of any minority trainees in a program truly comparable to the apprenticeship training program, and the absence of any procedure to permit qualified minority trainees to cross over to the faster apprenticeship training progression, constitutes substantial evidence of a pattern of discrimination in the training of individuals toward full journeyman status.

In our view this minority training program is not an executive-ordained quota system for hiring, such as those condemned in *Matter of Fullilove v Beame* (48 NY2d 376) and *Matter of Fullilove v Carey* (48 NY2d 826). Rather, this is a proper executive affirmative action program directed toward enlarging the pool of persons eligible for employment based on discrimination-free merit selection, as opposed to a quota system for hiring (*Matter of Broidrick v Lindsay,* 39 NY2d 641). As such, the program has not conformed to its stated purpose because of discrimination in training. There was substantial evidence of such discrimination.

The city cross-petitions from the administrative determination to the extent that it conditioned the award of compensatory damages to the city only upon petitioner's failure to comply with the injunctive provisions of the Commissioner's order. Because of the conditional nature of this award, we deem it unnecessary to consider that question at this time.

Although it is well settled that the Commissioner has considerable discretion in choosing remedies for proven discrimination, his power is not absolute (*State Div. of Human Rights v Binghamton Press Co.*, 67 AD2d 231). There is an abuse of discretion when the selection of remedies is erroneous as a matter of law or fails to bear a reasonable relationship to the proven discriminatory practices (*Matter of Imperial Diner v State Human Rights Appeal Bd.*, 52 NY2d 72).

Paragraph 3 of the order under review provides: "Without further examinations, the union shall offer all those individuals who successfully completed the four year Minority Trainee Program and have spent two or more calendar years as a 'M' journeyman, full Class 'A' journeyman status in Local No. 3, including Local No. 3 'A' cards (IBEW Journeyman Wireman 001 classification) and all other rights and privileges of 'A' membership."

Such provision is improper. In effect, it provides for issuance of "A" cards regardless of training, qualification or status. In contrast, every other union member must pass the "A" examination to become an "A" journeyman. Moreover, the public is entitled to such protection in terms of the qualification such an examination provides as a basis for demonstrating ability to perform the duties of an "A" journeyman. Such individuals should be afforded an opportunity to take the next scheduled "A" examination.

Accordingly, the petition by the president of Local 3 should be granted only to the extent of modifying the order of the State Human Rights Appeal Board, and the determination of the Commissioner of the State Division of Human Rights which it affirmed, by deleting the directive in paragraph 3 of the order that full "A" journeyman status be granted without further examination to individuals successfully having completed the four-year minority

training program and at least two years as an "M" journeyman, and substituting the following provisions therefor: (1) the individuals covered by paragraph 3 of the order should be afforded the opportunity to take the next scheduled "A" examination; (2) if they are not prepared to take the next scheduled "A" examination, they shall be referred to and receive such classroom and related instruction as is appropriate to prepare them to take the first subsequently scheduled "A" examination. The order and determination should be otherwise confirmed, without costs.

Ross, J. P., Lynch, Milonas and Alexander, JJ., concur.

Order, State Human Rights Appeal Board dated June 28, 1983, unanimously modified, by deleting the directive in paragraph 3 of the order that full "A" journeyman status be granted without further examination to individuals successfully having completed the four-year minority training program and at least two years as an "M" journeyman, and substituting the following provisions therefor: (1) the individuals covered by paragraph 3 of the order should be afforded the opportunity to take the next scheduled "A" examination; (2) if they are not prepared to take the next scheduled "A" examination, they shall be referred to and receive such classroom and related instruction as is appropriate to prepare them to take the first subsequently scheduled "A" examination. The order and determination are otherwise confirmed, without costs and without disbursements.