[645 NYS2d 926]

In the Matter of NEW YORK STATE OFFICE OF MENTAL HEALTH, MANHATTAN PSYCHIATRIC CENTER, Petitioner, v NEW YORK STATE DIVISION OF HUMAN RIGHTS et al., Respondents.

Third Department, July 25, 1996

**APPEARANCES OF COUNSEL**

*John V. Tauriello,* Albany *(Louis J. Patack* of counsel), for petitioner.

*Elaine A. Smith,* Buffalo, for New York State Division of Human Rights, respondent.

## OPINION OF THE COURT

CARDONA, P. J.

The 29 individual respondents in this proceeding (hereinafter collectively referred to as respondents) are either African American or Hispanic. During the relevant time periods they were employed as grade 9 Mental Health Therapy Aides (hereinafter MHTAs) for petitioner in one of its regional forensic units (hereinafter RFUs) located at petitioner's Manhattan Psychiatric Center (hereinafter Manhattan). Respondents were responsible for the treatment and custody of mentally ill patients found to be not guilty by reason of insanity (CPL 330.20) or incompetent to stand trial (CPL art 730). Petitioner established these RFUs in the early 1970's as a result of assuming responsibility for mentally ill patients that had formerly come under the aegis of the Department of Correctional Services (hereinafter DOCS). In addition to the Manhattan RFU, petitioner opened RFUs at its Hutchings Psychiatric Center (hereinafter Hutchings) in Onondaga County and its Gowanda Psychiatric Center (hereinafter Gowanda) in Erie County. These RFUs were also staffed by grade 9 MHTAs.

Petitioner also operated Mid-Hudson Forensic Psychiatric Center (hereinafter Mid-Hudson) in Orange County. Mid-Hudson replaced a forensic psychiatric center previously operated by DOCS. Unlike the RFUs, Mid-Hudson was not part of a civilian psychiatric facility but was a separate forensic facility. When petitioner took over the DOCS facility, it transferred that facility's employees (who were grade 14 correction officers) to Mid-Hudson. The employees kept their grade 14 status and acquired the new title of Secure Hospital Treatment Assistant (hereinafter SHTA). The majority of the SHTAs were white and non-Hispanic.

Between 1983 and 1985, respondents filed complaints with respondent State Division of Human Rights (hereinafter the Division) alleging that petitioner discriminated against them on the basis of race or ethnicity by employing them as grade 9 MHTAs at the Manhattan RFU, while a predominantly white workforce, doing similar work at Mid-Hudson, worked as grade 14 SHTAs. The matter was referred to an Administrative Law Judge (hereinafter ALJ) who, after a hearing, issued a decision and order finding in favor of respondents. The ALJ recom-

mended, *inter alia*, that respondents be awarded back pay and damages for mental anguish. On appeal to the Commissioner of the Division, the ALJ's findings of discrimination were accepted although the damages for mental anguish were reduced. Petitioner commenced this proceeding seeking annulment of the determination.

Although the Human Rights Law is to be construed liberally (*see*, Executive Law § 300) and deference is to be accorded the Commissioner's determination (*see, Matter of State Div. of Human Rights [Cottongim] v County of Onondaga Sheriff's Dept.*, 71 NY2d 623, 630), we, nevertheless, conclude that the finding of discrimination in this case is not supported by substantial evidence (*see, Matter of New York Tel. Co. v New York State Div. of Human Rights*, 222 AD2d 234; *Matter of New York State Off. of Mental Health, Kirby Forensic Psychiatric Ctr. v New York State Div. of Human Rights*, 210 AD2d 686, *lv denied* 86 NY2d 705). A finding of discriminatory practice may be based on proof of discriminatory intent or proof of discriminatory impact (*see, Campaign for Fiscal Equity v State of New York*, 86 NY2d 307, 322). In the matter at hand, the Division determined that no discriminatory motive or intent was evident and based its finding of discrimination on the disparate impact analysis. The Division concluded that the continued designation of black and Hispanic employees as grade 9 MHTAs at the Manhattan RFU while the Mid-Hudson white employees were paid as grade 14 SHTAs "presented a barrier to equality of job opportunity * * * [which] caused continuation of a workforce segregated with regard to pay scale". The record, however, fails to support the conclusion that respondents failed to receive grade 14 pay and SHTA status because of their race or ethnicity.

It was respondents' obligation to make out a prima facie case of disparate impact; this required proving, by a preponderance of the evidence, that a facially neutral practice had a racially disproportionate effect (*see, Campaign for Fiscal Equity v State of New York, supra*, at 322-323). Some employment practices, adopted without discriminatory motive, may be in operation functionally equivalent to intentional discrimination and thus have a disparate impact (*see, Watson v Fort Worth Bank & Trust*, 487 US 977, 987; *State Div. of Human Rights v Kilian Mfg. Corp.*, 35 NY2d 201, 208, *appeal dismissed* 420 US 915). A prima facie case of disparate impact is not established by a simple showing of statistical disparities in an employer's workforce (*see, Watson v Fort Worth Bank & Trust, supra*, at 994).

The specific employment practice responsible for the statistical disparities must be identified and the statistical evidence must be of a kind and degree sufficient to show that the practice in question caused the exclusion because of, in this case, race or national origin (*see, supra,* at 994).

Respondents failed to make out a prima facie case of racial or ethnic discrimination. We reach this conclusion even accepting that the job duties at both the Manhattan RFU and at Mid-Hudson were essentially the same as well as the undisputed fact that SHTAs at Mid-Hudson were predominantly white and MHTAs at the Manhattan RFU were 100% black or Hispanic. The mere fact that there is racial imbalance in one segment of an employer's workforce does not, without more, establish a prima facie case of disparate impact (*see, Wards Cove Packing Co. v Atonio,* 490 US 642, 653). Instead of simply comparing the SHTAs at Mid-Hudson with the MHTAs at the Manhattan RFU, the Division should have also correlated the MHTAs at the Gowanda and Hutchings RFUs with the MHTAs at the Manhattan RFU. Although the Division refused to do so, we find such refusal to be without support in the record. The Division noted that the Gowanda and Hutchings RFUs were smaller than the Manhattan RFU and, therefore, employed fewer MHTAs; this, however, has no bearing on the *type* of work in the units.

The Division also found insufficient evidence as to how the specific duties in question were carried out in the other RFUs. Petitioner's witness, however, repeatedly testified that the MHTAs at all three RFUs performed the same job duties and responsibilities with the same types of patients.* There was no evidence presented by respondents to refute this testimony and they failed to show that the employees at Gowanda and Hutchings did not have the same basic responsibilities as the employees at Manhattan (*see, Texas Dept. of Community Affairs v Burdine,* 450 US 248, 258). Petitioner's witness also testified that the majority of MHTAs at both the Gowanda and Hutchings RFUs were white. Given this evidence, we cannot accept the assertion that the pay inequity between Mid-Hudson and the Manhattan RFU was based upon race or ethnicity. Instead, the evidence demonstrates that the difference in pay was due

---

* The only difference in patient population is that the RFU at Hutchings had an additional category of patients called "508" patients—pretrial detainees who, because of mental illness, required hospitalization. Petitioner's witness specifically testified that it could not be said that there was any difference as to the difficulty in the custody and care of these patients.

to the fact that the SHTAs at Mid-Hudson were allowed to keep their grade 14 status when transferred to that facility.

Nor do we accept the claim that petitioner, by its own actions, revealed a distinction between the downstate facilities at Mid-Hudson and Manhattan and the upstate units at Hutchings and Gowanda. Respondents rely on the fact that in 1980 the Manhattan RFU was scheduled to be replaced by a totally new facility strictly for forensic patients while the RFUs at Gowanda and Hutchings were not so scheduled. This occurrence, however, fails to support respondents' argument. In February 1985, the entire forensic unit at Manhattan was transferred to Kirby Forensic Psychiatric Center (hereinafter Kirby), also located in Manhattan. The record reveals that prior to 1980, all three of the RFUs were established as less restrictive alternatives than Mid-Hudson where patients who were in need of a more secure placement were sent. Petitioner's witness explained that after 1980, greater emphasis was placed on security at all of the RFUs. Although the security at the Gowanda and Hutchings facilities was increased, it was determined that the Manhattan RFU could not be made secure enough. Accordingly, it was decided that it was necessary to build the separate Kirby facility instead. Given this evidence and respondents' failure to offer any facts to rebut it, the building of the Kirby facility is not proof that petitioner considered the Manhattan RFU to be different from the Gowanda and Hutchings facilities in terms of the patients and the work performed at each of the RFUs. Rather, the decision to build the separate Kirby facility was related only to reasons of security.

Respondents also point to the fact that petitioner sought and obtained a grade 11 title for the MHTAs at the Gowanda and Hutchings RFUs while the MHTAs at the Manhattan RFU later became grade 14 SHTAs at Kirby. They claim that this confirms that the work at Gowanda and Hutchings differed from the work at Manhattan. As petitioner notes, however, it initially sought to obtain a higher grade status for all three facilities, not just Gowanda and Hutchings. Petitioner actually sought either a grade 11 or grade 14 status for all three facilities. It was the Department of Civil Service that determined that the grade 11 status was more appropriate. The only reason that Gowanda and Hutchings eventually were the only two facilities to receive an upgrade to grade 11 was because of petitioner's decision after 1980 to create a more secure facility to replace the Manhattan RFU. It is for this reason that those

employees going from the Manhattan RFU to Kirby became grade 14 SHTAs instead of grade 11 status.

Petitioner also correctly points out that it did not have the authority to grant a grade change (see, Civil Service Law § 118). We are aware that although petitioner and the Department of Civil Service differentiated Mid-Hudson and apparently Kirby from the RFUs on the basis that they were designed to care for a more dangerous clientele, the record reveals that the job duties at all the RFUs, including Manhattan, were substantially similar with Mid-Hudson and Kirby. Nevertheless, while this may be evidence that respondents were performing out-of-title work and should have been accorded grade 14 status on that basis, it fails to establish that they were discriminated against based on race or ethnicity. This conclusion finds further support in the fact that the MHTAs at Gowanda and Hutchings, who also failed to receive grade 14 status, were predominantly white.

Given this proof, we find that the basis for the Division's conclusion of racial and/or ethnic discrimination to be flawed and not supported by substantial evidence (see, Matter of New York State Off. of Mental Health, Kirby Forensic Psychiatric Ctr. v New York State Div. of Human Rights, 210 AD2d 686, supra). In light of our conclusion it is unnecessary to address the parties' remaining arguments.

MIKOLL, CREW III, YESAWICH JR. and SPAIN, JJ., concur.

Adjudged that the determination is annulled, without costs, and petition granted.